IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

FEDERAL NATIONAL MORTGAGE              )
ASSOCIATION,                           )
                                       )
              Plaintiff,               )      Case No. 13 CIV 7720 (NRB)
                                       )
        v.                             )
                                       )
BARCLAYS BANK PLC; UBS AG; THE ROYAL   )      **COMPLAINT**
BANK OF SCOTLAND GROUP PLC; THE ROYAL  )
BANK OF SCOTLAND PLC; DEUTSCHE BANK AG;)
CREDIT SUISSE GROUP AG; CREDIT SUISSE  )
INTERNATIONAL; BANK OF AMERICA         )
CORPORATION; BANK OF AMERICA, N.A.;    )
CITIGROUP INC.; CITIBANK, N.A.; J.P. MORGAN )
CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; )
COOPERATIVE CENTRALE RAIFFEISEN-       )
BOERENLEENBANK B.A.; BRITISH BANKERS   )
ASSOCIATION; and BBA LIBOR, LTD.,      )
                                       )
              Defendants.              )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff Federal National Mortgage Association ("Fannie Mae"), by its counsel, alleges

as follows:

## I.    INTRODUCTION

        1.      This case arises from the pervasive—and, as to four Defendants, admitted—

manipulation of the London Interbank Offered Rate for the U.S. dollar ("USD Libor" or

"Libor"). Defendants' wrongful conduct caused Fannie Mae, a government-sponsored enterprise

charged by Congress with a mission to provide liquidity, stability, and affordability to the United

States housing and mortgage markets, to suffer hundreds of millions of dollars in direct,

foreseeable damages.

2.      Libor has served as the benchmark interest rate for hundreds of trillions of dollars of financial instruments.  For years, the British Bankers Association (BBA) calculated Libor each day based on the rates that sixteen major banks, including Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, Bank of America, Citibank, JPMorgan, and Rabobank (collectively the "Libor Panel Defendants") reported as their costs of borrowing.  Under BBA rules, each contributing bank was required to submit quotes at which the bank believed it could borrow unsecured interbank funds in the London market.

3.      During the relevant period, Fannie Mae entered into and performed on a huge volume of transactions—including interest-rate swaps and purchases of mortgages, mortgage-backed securities, and variable-rate loans—pursuant to which it was to receive or pay an interest rate that was indexed to Libor.  In Fannie Mae's interest-rate swaps, which were governed by written contracts promulgated by the International Swaps and Derivatives Association (ISDA), Fannie Mae's counterparties (which included every Libor Panel Defendant except Rabobank) promised, among other things, that they would calculate, value, and settle transactions at a legitimate, honest Libor rate—that is, a rate determined in good faith and in compliance with the legitimate benchmark-setting process established by the BBA.  In connection with all of Fannie Mae's Libor-indexed transactions, the Libor Panel Defendants and BBA represented, among other things, that Libor was based on honest submissions that were consistent with the published definition of Libor.

4.      Unbeknownst to Fannie Mae, Defendants' promises and representations regarding the legitimacy of Libor were false.  Convincing evidence now demonstrates that the Libor Panel Defendants, with active assistance from each other and the BBA, wrongfully suppressed Libor during the relevant period.

5.     Four banks—Barclays, UBS, RBS, and Rabobank—recently settled regulatory actions alleging Libor manipulation and entered into non-prosecution or deferred prosecution agreements.   In the settlement documents, these Defendants admitted making false and misleading Libor submissions.  First, Barclays acknowledged that it "often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submissions should have been."[1]  Second, UBS conceded that it "used false benchmark interest rate submissions, including U.S. Dollar LIBOR, to protect itself against media speculation concerning its financial stability during the financial crisis."[2]   Third, RBS "inappropriately considered the impact of LIBOR and RBS's LIBOR submissions on the profitability of transactions in its money market trading books as a factor when making (or directing others to make) . . . USD Libor submissions."[3]  Fourth, "Rabobank swaps traders requested that certain Rabobank LIBOR and Euribor submitters submit LIBOR and Euribor contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of LIBOR and Euribor."[4]

6.     The remaining Libor Panel Defendants—Deutsche Bank, Credit Suisse, Bank of America, Citibank, and JPMorgan—are all the subject of regulatory investigations regarding

---

[1]  Statement of Facts in Connection with Non-Prosecution Agreement Between the United States Department of Justice, Criminal Division, Fraud Section, and Barclays Bank (the "Barclays DOJ SOF") ¶ 36 (June 26, 2012), *available at* http://www.justice.gov/iso/opa/resources/337201271017335469822.pdf, http://www.justice.gov/iso/opa/resources/9312012710173426365941.pdf.

[2]  *In the Matter of UBS AG and UBS Securities Japan Co., Ltd.*, CFTC Dkt. No. 13-09, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings Imposing Remedial Sanctions (the "UBS CFTC Order") at 2 (Dec. 19, 2012), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfubsorder121912.pdf.

[3]  FSA Final Notice to The Royal Bank of Scotland ("RBS FSA Final Notice") ¶ 5 (Feb. 6, 2013), *available at* http://www.fsa.gov.uk/static/pubs/final/rbs.pdf.

[4]  Statement of Facts in Connection with Deferred-Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section, the United States Department of Justice, Antitrust Division, and Rabobank ("Rabobank DOJ SOF") ¶ 78 (Oct. 29, 2013), *available at* http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf.

alleged Libor manipulation.  The United Kingdom's Serious Fraud Office recently charged a former UBS and Citigroup trader with conspiring with employees of eight banks, including Deutsche Bank and JPMorgan, to "dishonestly seek[] to manipulate [Libor] . . . with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another."[5]  In response to the charges, the former trader has stated that other senior-level executives at Citigroup were aware of and condoned his actions.

7.     Like those banks that have admitted wrongdoing, the other Defendants' Libor quotes were consistently lower than comparable benchmarks.  From 2002 to 2006, for example, the spreads between the Defendants' Libor quotes and the Eurodollar Deposit Rate varied between 0.01% and 0.03%.  From 2007 until the middle of 2010, the spreads not only turned negative, but were significantly inverted with values ranging from -0.24% to -0.33% on average.  The spreads between admitted-manipulator Barclays' Libor quotes and the Eurodollar Deposit Rate were generally the smallest among the Libor Panel Defendants.

8.     A comparison of the Libor Panel Defendants' quotes with their credit default swap spreads tells the same story.  From August 2007 to June 2010, approximately 80% of Citibank's quotes fell below the median Libor quote for the day while on the same day its credit default swap spread was above the median.  The same was true for approximately 40% of Bank of America's submissions, about 30% of UBS's submissions, a little less than 30% of RBS's and JPMorgan's submissions, and 20% of Deutsche Bank's and Barclays' submissions.

9.     The Chairman of the United States Commodity Futures Trading Commission (CFTC) recently described the Libor scandal in the following blunt terms:

> [A]s law enforcement actions brought by the CFTC, the FCA and the U.S. Justice Department, among others, have shown, ***LIBOR and other benchmarks have been readily and pervasively rigged***.  Barclays, UBS and RBS paid fines of

---

[5] David Enrich, *Libor Case Ensnares More Banks*, Wall St. J. (June 20, 2013).

approximately $2.5 billion for manipulative conduct relating to these rates. At each bank, the misconduct spanned many years. At each bank it took place in offices in several cities around the globe. At each bank it included numerous people – sometimes dozens, among them senior management. . . . ***And in each case, there was evidence of collusion with other banks.*** In the UBS and RBS cases, one or more inter-dealer brokers painted false pictures to influence submissions of other banks, i.e., to spread the falsehood more widely. Barclays and UBS also were reporting falsely low borrowing rates in an effort to protect their reputations.[6]

10.     Fannie Mae estimates that it suffered approximately $800 million in damages as a direct and foreseeable result of Defendants' concerted suppression of Libor. Fannie Mae sustained these damages on swaps, mortgages, mortgage-backed securities, and other variable-rate transactions with Defendants and other counterparties. Of its total damages, Fannie Mae estimates that it lost $332 million on interest-rate swaps with Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, Bank of America, Citibank, and JPMorgan.

11.     Fannie Mae now seeks relief for all of the damages that it suffered as a result of Defendants' unlawful actions and asserts claims for breach of contract, breach of the implied duty of good faith and fair dealing, fraud, aiding and abetting fraud, and conspiracy to commit fraud.

## II. <u>JURISDICTION AND VENUE</u>

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), (c). Diversity is present because Fannie Mae's charter, 12 U.S.C. § 1717(a)(2)(b), provides that Fannie Mae "shall be deemed, for purposes of jurisdiction in civil actions, to be a District of Columbia corporation," and none of the Defendants are citizens of Washington, D.C. The amount in controversy exceeds the jurisdictional minimum of this court. The EDGE Act, 12 U.S.C. § 632, also provides federal jurisdiction because Fannie Mae and certain Defendants are

---

[6] *See Remarks of CFTC Chairman Gary Gensler at London City Week on Benchmark Interest Rates* (Apr. 22, 2013) (emphasis added), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-140.

organized under the laws of the United States and this case arises, at least in part, out of "transactions involving international or foreign banking" and/or "other international or foreign financial operations."

13.     This Court has both general and specific personal jurisdiction over the Defendants.  All Defendants do business in and/or derive substantial revenue from activities carried out in New York.  Defendants also engaged in significant business activity in New York as it pertains to the transactions with Fannie Mae that are at issue in this case.

14.     Venue is proper in the Southern District of New York.  Many Defendants maintain offices or agents, transact business, or are found within the District, and Fannie Mae's contracts with Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, Bank of America, Citibank, and JPMorgan identify the courts in New York as a permissible forum for the resolution of disputes.

## III. <u>PARTIES</u>

15.     Plaintiff Fannie Mae is a government-sponsored enterprise charged by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  It is organized and existing under the laws of the United States with its principal place of business at 3900 Wisconsin Avenue, NW, Washington, DC  20016.

16.     Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England.  Barclays was at all relevant times a USD Libor panel bank.  At all relevant times, Barclays and Fannie Mae were parties to an ISDA Master Agreement pursuant to which they entered swap transactions whereby Fannie Mae sustained substantial injuries because Libor was manipulated.

17.     Defendant UBS AG (UBS) is a Swiss company based in Basel and Zurich, Switzerland.  UBS was at all relevant times a USD Libor panel bank.  At all relevant times, UBS and Fannie Mae were parties to an ISDA Master Agreement pursuant to which they entered swap transactions whereby Fannie Mae sustained substantial injuries because Libor was manipulated.

18.     Defendant The Royal Bank of Scotland Group plc is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  The Royal Bank of Scotland Group plc was at all relevant times a USD Libor panel bank.  Defendant The Royal Bank of Scotland plc is a public limited company headquartered in Edinburgh, Scotland and a subsidiary of The Royal Bank of Scotland Group plc.  At all relevant times, The Royal Bank of Scotland plc and Fannie Mae were parties to an ISDA Master Agreement pursuant to which they entered swap transactions whereby Fannie Mae sustained injuries because Libor was manipulated.  Unless the context dictates otherwise, The Royal Bank of Scotland Group plc and The Royal Bank of Scotland are collectively referred to as RBS.

19.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  Deutsche Bank was at all relevant times a USD Libor panel bank.  At all relevant times, Deutsche Bank and Fannie Mae were parties to an ISDA Master Agreement pursuant to which they entered swap transactions whereby Fannie Mae sustained substantial injuries because Libor was manipulated.

20.     Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.  Credit Suisse Group AG was at all relevant times a USD Libor panel bank. Defendant Credit Suisse International is a wholly owned subsidiary of Credit Suisse Group AG. At all relevant times, Credit Suisse International and Fannie Mae were parties to an ISDA Master Agreement pursuant to which they entered swap transactions whereby Fannie Mae sustained

substantial injuries because Libor was manipulated.  Unless the context dictates otherwise, Credit

Suisse International and Credit Suisse Group AG are collectively referred to as "Credit Suisse."

21.     Defendant Bank of America Corporation is a Delaware corporation headquartered

in Charlotte, North Carolina.  Bank of America Corporation was at all relevant times a USD

Libor panel bank.   Defendant Bank of America, N.A. is a national banking association

headquartered in Charlotte, North Carolina, and a wholly owned subsidiary of Bank of America

Corporation.  At all relevant times, Bank of America, N.A. and Fannie Mae were parties to an

ISDA Master Agreement pursuant to which they entered swap transactions whereby Fannie Mae

sustained substantial injuries because Libor was manipulated.   Unless the context dictates

otherwise, Bank of America, N.A. and Bank of America Corporation are collectively referred to

as "BofA" or "Bank of America."

22.     Defendant Citigroup Inc. is a Delaware corporation headquartered in New York,

New York.  Citigroup or its wholly owned subsidiary, Defendant Citibank, N.A., which is

headquartered in New York, New York, was at all relevant times a USD Libor panel bank.  At

all relevant times, Citibank and Fannie Mae were parties to an ISDA Master Agreement pursuant

to which they entered swap transactions whereby Fannie Mae sustained substantial injuries

because Libor was manipulated.   On information and belief, Citigroup participated in the

unlawful conduct alleged in this Complaint both directly and through its subsidiaries and

affiliates.   Unless the context dictates otherwise, Citigroup Inc. and Citibank, N.A. are

collectively referred to as "Citibank."

23.     Defendant J.P. Morgan Chase & Co. is a Delaware corporation headquartered in

New York.   J.P. Morgan Chase & Co. was at all relevant times a USD Libor panel bank.

Defendant J.P. Morgan Chase Bank, N.A. is a national banking association headquartered in

Columbus, Ohio and a subsidiary of J.P. Morgan Chase & Co.  At all relevant times, J.P. Morgan Chase Bank, N.A. and Fannie Mae were parties to an ISDA Master Agreement pursuant to which they entered swap transactions whereby Fannie Mae sustained injuries because Libor was manipulated.  Unless the context dictates otherwise, J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A. are collectively referred to as "JPMorgan."

24.     Defendant Cooperative Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in the Netherlands.  Rabobank was at all relevant times a USD Libor panel bank.  Rabobank has banking divisions and branches around the world, including in the United States, with its United States branch headquartered in New York.

25.     The above Defendants are referred to collectively herein as the "Libor Panel Defendants."

26.     Defendant British Bankers Association (BBA) is a trade association based in the United Kingdom.  Since 1986, the BBA has calculated and published Libor for ten different currencies based on submissions made by a panel of banks selected for each currency, including the Libor Panel Defendants, which participate in setting the USD Libor.  Defendant BBA LIBOR, Ltd. is a subsidiary incorporated by the BBA in late 2009.  The BBA and BBA LIBOR, Ltd. aided, abetted, and conspired with the Libor Panel Defendants to publish false Libor rates.  They also actively concealed the Libor Panel Defendants' wrongdoing by publishing false reports and making false statements regarding Libor.

27.     The BBA and BBA LIBOR, Ltd. purposefully availed themselves of the benefits of doing business in the United States generally and in New York specifically by, for example, advertising Libor in the United States and New York.  In 2007, the BBA sought and obtained a trademark for Libor from the United States Patent and Trademark Office.   The BBA

communicated news and information through internet websites and *The Wall Street Journal*. The BBA published Libor data to more than a million computer screens around the world, including in the United States and New York.  In 2009, the BBA launched a Twitter social media service news feed.  The BBA also maintained a Facebook page accessible from New York.

28.     Various other entities and individuals, the identities of which are unknown to Fannie Mae at this time, may have participated as co-conspirators with Defendants in the violations alleged in this Complaint and/or performed substantial acts and made statements in furtherance of the alleged violations.

## IV.  FACTUAL ALLEGATIONS

### A.     An Overview of Libor

29.     During the relevant period, Libor was a primary benchmark interest rate used in financial markets around the world.  Swaps, futures, options, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide are calculated and settled based on Libor.  In addition, mortgages, credit cards, student loans, and other consumer lending products frequently use Libor as a reference rate.  Financial institutions around the world, including Fannie Mae, reasonably relied on Libor as an honest and accurate benchmark for financial transactions.

30.     During the relevant period, Libor was calculated daily by Thomson Reuters on behalf of the BBA.  Libor was based on the rates that sixteen major banks, including the Libor Panel Defendants, reported as their costs of borrowing.  The BBA published rules governing the way that contributor banks determined their submissions, and the contributor banks agreed to abide by those rules to remain on the Libor-setting panel of banks.  Since approximately 1998, the BBA defined Libor as "[t]he rate at which an individual Contributor Panel bank could

borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00[a.m.] London time."

31.     The BBA mandated that each contributor bank submit its rate without reference to rates contributed by other banks.  The BBA's "definitions and criteria did not permit panel banks to base their submissions, in whole or in part, on a bank's desire to avoid negative media attention or reputational harm."[7]  Furthermore, according to a BBA publication issued in June 2008, the basis for a contributor panel bank's submission must be the rate at which members of the bank's staff primarily responsible for management of the bank's cash—rather than the bank's traders—consider that the bank can borrow unsecured inter-bank funds in the London money market.

32.     The BBA did not monitor compliance with its own mandates, however.  On information and belief, the BBA provided no oversight or auditing whatsoever of the contributor banks' methods of setting their USD Libor submissions.  On information and belief, the BBA put no structures in place to prevent contributor panel banks from consulting one another before setting their USD Libor submissions.  Nor was the necessary oversight supplied by any other organization.  The BBA consciously disregarded these critical structural deficiencies, which left the USD-Libor-setting process highly vulnerable to manipulation, abuse, and collusion.  These problems were not disclosed to Fannie Mae.

33.     After receiving the daily submissions from the sixteen contributor banks, the BBA would discard the upper four and lower four quotes and set USD Libor by calculating the mean value of the remaining eight quotes.  Thomson Reuters then published Libor.

---

[7] UBS CFTC Order, *supra* note 2, at 42.

34.     Because a bank's Libor contributions "should correspond to the cost at which the bank perceives that it can borrow funds in the relevant market, a bank's Libor contributions may be viewed as an indicator of a bank's creditworthiness."[8]  For example, if a contributor bank's Libor submission is relatively high as compared to other contributor banks, that submission could suggest that the contributor bank is paying a relatively high amount to borrow funds and therefore could be perceived as having financial difficulties.

35.     The Defendants understood the importance of Libor, and the BBA actively promoted Libor as a key benchmark rate:

> BBA LIBOR is by far the most widely referenced interest rate index in the world. Its importance goes beyond that of inter bank lending and touches everyone from large international conglomerates to small borrowers.  ***It is central in interest rate swaps and the great majority of floating rate securities and loans relate to LIBOR.  Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA LIBOR***.  It is the basis for settlement of interest rate contracts on the world's major future and options exchanges.  ***It is written into standard derivative and loan documentation such as the ISDA terms*** and is also used for an increasing range of retail products.[9]

36.     Fannie Mae entered a huge volume of transactions with Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, BofA, Citibank, JPMorgan and other counterparties involving products that incorporated USD Libor, including several billion dollars of interest-rate swap, swaption, and other derivative transactions (collectively "interest-rate swap transactions," "swap transactions," or "swaps") governed by ISDA contracts.  Fannie Mae reasonably relied on the honesty of Defendants and Libor as an honest benchmark rate in entering into, valuing, and performing under these Libor-indexed transactions.

---

[8]  UBS Statement of Facts in Connection with Non-Prosecution Agreement Between the United Stated Department of Justice, Criminal Division, Fraud Section, and UBS AG (the "UBS DOJ SOF") ¶ 99 (Dec. 18, 2012), *available at* http://www.justice.gov/iso/opa/resources/1392012121911745845757.pdf; http://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf.

[9]  BBA, *Understanding the Construction and Operation of LIBOR—Strengthening for the Future*, § 1.1 (June 10, 2008) (emphasis added), *available at* http://www.bbalibor.com/archive/bba-announces-steps-to-strengthen-libor.

**B.**     **Government Investigations Regarding Libor Are Revealed**

37.     On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the United States Department of Justice (DOJ) and CFTC in conjunction with investigations into Libor.  This note marked the first public notice by any Defendant of the confidential government investigations.  The UBS Annual Report stated that the investigations focused on whether there were improper attempts by UBS, either acting on its own behalf or together with others, to manipulate Libor.

38.     The next day, March 16, 2011, *Financial Times* reported that regulators had also subpoenaed BofA, Citigroup, and Barclays regarding USD Libor.  *Financial Times* further noted that "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08 received informal requests for information."[10]

39.     On March 23, 2011, *Bloomberg* revealed that Citigroup, Deutsche Bank, BofA, and JPMorgan were asked by United States regulators "to make employees available to testify as witnesses" in connection with regulators' ongoing investigations.[11]

40.     The nature and extent of Defendants' wrongful conduct began to emerge over the ensuing months:

- A Competition Law Officer from the Canadian Competition Bureau submitted an affidavit in May 2011 in support of an ex parte application asking the Canadian courts to compel HSBC, RBS, Deutsche Bank, JPMorgan, and Citigroup to produce documents.  The Canadian investigation relates to whether those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010."[12]

---

[10]  Brooke Masters, et al., *Banks served subpoenas in Libor Case*, Financial Times (Mar. 16, 2011).

[11]  Joshua Gallu & Donald Griffin, *Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank*, Bloomberg (Mar. 23, 2011).

[12]  *Canada Investigating some banks as LIBOR probe widens*, Reuters (Feb. 15, 2012).

- On February 3, 2012, Credit Suisse disclosed that the Swiss Competition Commission had commenced an investigation involving twelve banks, including Credit Suisse and certain other financial intermediaries, concerning potential collusion among traders to affect and influence the bid-ask spread for derivatives tied to Libor.[13]

- On February 14, 2012, *Bloomberg* reported that European Union antitrust regulators were investigating whether banks formed a cartel to manipulate interest rates.[14]

- In September 2012, sources reported that a former trader for RBS, Tan Chi Min, filed a 231-page affidavit with the Singapore High Court that included contemporaneous messages authored during his tenure at RBS that reveal fraud and collusion.  In one message dated August 19, 2007, Mr. Tan wrote in an electronic discussion with traders at other banks, including Deutsche Bank's Mark Wong:  "It's just amazing how Libor fixing can make you that much money or lose if opposite. . . .  It's a cartel now in London."[15]

- In October 2012, it was reported that the New York Attorney General had issued subpoenas to nine banks, including Credit Suisse, as part of an investigation into Libor manipulation.

- Citigroup's 2012 10-K summarized the broad scope of government investigations into Libor manipulation: "Government agencies in the U.S., including the Department of Justice, the Commodity Futures Trading Commission, the SEC, and a consortium of state attorneys general, as well as agencies in other jurisdictions, including the European Commission, the U.K. Financial Services Authority, the Japanese Financial Services Agency, the Canadian Competition Bureau, the Swiss Competition Commission and the Monetary Authority of Singapore, are conducting investigations or making inquiries regarding submissions made by panel banks to bodies that publish various interbank offered rates and other benchmark rates.  As members of a number of such panels, Citigroup subsidiaries have received requests for information and documents."[16]

---

[13]  Elena Longenkova, *UBS, Credit Suisse Among Banks in Swiss Libor-Fixing Probe*, Bloomberg (Feb. 3, 2012).

[14]  Lindsay Fortado & Joshua Gallu, *Libor Probe Said to Expose Collusion, Lack of Internal Controls*, Bloomberg (Feb. 14, 2012).

[15]   Andrea Tan, Gavin Finch, & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg (Sept. 26, 2012).

[16]   Citigroup, Form 10-K (fiscal year 2012) at 285, *available at* http://www.citigroup.com/citi/investor/data/k12c.pdf?ieNocache=7.

- Bank of America, Deutsche Bank, and JPMorgan disclosed in their 2012 10-Ks that they had received subpoenas from regulatory and law enforcement agencies regarding the setting of Libor and other benchmark rates.[17]

**C.**     **Libor Settlements and Admissions of Wrongdoing**

41.     Between June 2012 and October 2013, Barclays, UBS, RBS, and Rabobank all admitted to making false and misleading Libor submissions to the BBA and admitted that the Libor rates published by and through the BBA were materially false and misleading.  These wrongful and conspiratorial acts, which were revealed for the first time in connection with the settlement agreements with regulators, resulted in the systematic and significant suppression of the USD Libor between at least 2007 and 2010.

42.     On June 26, 2012, Barclays entered into settlement and non-prosecution agreements with the DOJ and CFTC, paying total fines and penalties of $450 million.  According to filings in connection with these agreements, Barclays admitted that it repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD Libor and other currencies.  Barclays acknowledged that its suppression of Libor negatively impacted its interest-rate swap counterparties:

> In the instances when the published rates were manipulated in Barclays's favor due to Barclays's manipulation of its submissions, that manipulation benefitted Barclays swap traders[.] . . . Certain Barclays swap traders and rate submitters who engaged in efforts to manipulate LIBOR and EURIBOR submissions were well aware of the basic features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions. When the requests of the swap traders for favorable LIBOR and EURIBOR submissions were taken into account by the rate submitters, Barclays's rate

---

[17]     BofA, Form 10-K (fiscal year 2012) at 237, *available at* http://www.sec.gov/Archives/edgar/data/70858/000007085813000097/bac-12312012x10k.htm; Deutsche Bank, Annual Report (fiscal year 2012) at 432, *available at* https://annualreport.deutsche-bank.com/2012/ar/servicepages/downloads/files/dbfy2012_entire.pdf; JPMorgan, Form 10-K (fiscal year 2012) at 319, *available at* http://www.sec.gov/Archives/edgar/data/19617/000001961713000221/corp10k2012.htm.

submissions were false and misleading. ***In making and accommodating the requests, the swap traders and submitters engaged in a deceptive course of conduct in an effort to gain advantage over their counterparties***.[18]

Barclays further admitted: "From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate U.S. Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its U.S. Dollar LIBOR submissions should have been."[19]

43.     In July 2012, *Bloomberg* reported that the Libor scandal "has the potential to become one of the most costly and consequential in the history of banking," observing that investigators in the United States, Canada, Europe, and Asia "are piecing together a breathtaking portrait of avarice and deceit" and that Barclays' $450 million penalty was only the beginning.[20] *Bloomberg* was right.

44.     On December 19, 2012, the DOJ, CFTC, United Kingdom Financial Services Authority (FSA), and Swiss Financial Market Supervisory Authority (FINMA) announced settlements with UBS arising from the bank's manipulation of Libor and other benchmark rates. In connection with the settlements, which collectively obligated UBS to pay approximately $1.5 billion, the agencies detailed UBS's misconduct.  The Order entered by the CFTC concluded:

> [F]rom approximately August 2007 to mid-2009, UBS, at times, used false benchmark interest rate submissions, including U.S. Dollar LIBOR, to protect itself against media speculation concerning its financial stability during the financial crisis.[21]

---

[18]  Barclays DOJ SOF, *supra* note 1 ¶¶ 32-33 (emphasis added).

[19]  *Id.* ¶ 36.

[20]  Editorial, "*The Worst Banking Scandal Yet?*," Bloomberg (July 12, 2012).

[21]  UBS CFTC Order, *supra* note 2, at 2.

UBS's settlement with the DOJ contained similarly incriminating findings, such as UBS's instructions that Libor submitters should "err on the low side" or aim to be in "the middle of the pack" relative to other contributor banks.[22]

45.    On February 5, 2013, RBS agreed to pay approximately $615 million to settle charges by regulators in the United States and the United Kingdom regarding Libor manipulation.  Under the terms of those settlements, RBS admitted various facts relating to its involvement in fraudulent and collusive practices relating to Libor submissions.  The FSA's Final Notice contained the following pointed conclusion:  "RBS also inappropriately considered the impact of LIBOR and RBS's LIBOR submissions on the profitability of transactions in its money market trading books as a factor when making (or directing others to make) . . . USD LIBOR submissions."[23]

46.    On October 29, 2013, Rabobank agreed to pay United States, British, Dutch, and Japanese regulators and prosecutors approximately $1 billion to settle allegations regarding its manipulation of Libor and other interest rates.  Rabobank admitted that its submissions were false and misleading, and the DOJ found that, "Not only was [Rabobank's] conduct fraudulent, it compromised the integrity of globally-used interest rate benchmarks—undermining financial markets worldwide."  When announcing its Deferred Prosecution Agreement with Rabobank, the DOJ made clear that its investigation regarding Libor was ongoing:  "[O]ther banks should pay attention: our investigation is far from over."[24]

---

[22]  UBS DOJ SOF, *supra* note 8 ¶ 100.

[23]  RBS FSA Final Notice, *supra* note 3 ¶ 5.

[24]  Press Release, *Rabobank Admits Wrongdoing in Libor Investigation, Agrees to Pay $325 Million Criminal Penalty*, DOJ Office of Public Affairs (Oct. 29, 2013), *available at* www.justice.gov/opa/pr/2013/October/13-crm-1147.html.

**D.**     **Facts Made Public in Connection with Libor Settlements**

47.     As set out below, the conduct described in the Barclays, UBS, RBS, and Rabobank settlements paints a detailed picture of these Libor Panel Defendants' secret and lucrative efforts to control and manipulate Libor.  On information and belief, the other Libor Panel Defendants conspired with each other; with Barclays, UBS, RBS, and Rabobank; with the BBA; and with others known and unknown to submit false Libor quotes and, toward that end, engaged in conduct similar to that described in the Barclays, UBS, RBS, and Rabobank settlements.

48.     The UBS SOF revealed that on August 9, 2007, a UBS executive sent a secret directive to certain senior managers that "UBS should be submitting LIBORs 'on the low side' relative to other panel banks' submissions" and that "it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.  Fixing risk and [profit and loss] thereof is secondary priority for now."[25]  UBS promptly disseminated the directive, and its traders complied.[26]

49.     According to an article published in December 2012 based on secret transcripts obtained from a Singapore court proceeding, on August 20, 2007, RBS's manager responsible for USD Libor submissions, Paul Walker, telephoned RBS's head of short-term markets for Asia, Scott Nygaard, to discuss the fact that banks were using Libor to profit on its movements rather than submitting rates that honestly reflected their perceived costs of borrowing.  Walker reportedly told Nygaard:  "People are setting to where it suits their book . . . Libor is what you say it is."  The article further reported that at least as of August 2007, senior RBS managers

---

[25]  UBS DOJ SOF, *supra* note 8 ¶¶ 102-105.

[26]  UBS CFTC Order, *supra* note 2, at 43.

knew that the Libor panel banks were "systematically rigging LIBOR" and that "[s]ome [RBS] traders colluded with counterparts at other banks to boost profits from interest-rate futures by aligning their submissions."[27]

50.    Barclays admitted in its settlement agreement that in August 2007, senior managers instructed Barclays' USD Libor submitters to lower their quotes so that they would stay "within the pack," nearer to the rates of other Libor panel banks than rates that were consistent with the BBA's definition of Libor.  Barclays' directive to stay "within the pack" with other Libor panel banks remained in place and was repeated through at least 2009 and, on information and belief, longer.  Barclays has admitted that its USD Libor submissions were false because they were lower than Barclays would otherwise have submitted and contrary to the definition of Libor.[28]

51.    Barclays also disclosed that its managers were aware that other Libor panel banks were doing the same.  In one August 2007 internal email, a Barclays employee noted that Lloyds' Libor submission was artificially low.[29]  On November 30, 2007, a representative of Barclays had a discussion with the FSA about Barclays' Libor submissions.  During this discussion, the Barclays representative "didn't say anything along the lines of, you know, we're not posting where we think we should." [30]  On December 4, 2007, a Barclays Libor submitter

---

[27]  Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg (Dec. 13, 2012).

[28]  Barclays DOJ SOF, *supra* note 1 ¶ 36.

[29]  *See* Ex. 1, N.Y. Fed. Reserve Bank, Email to Pat Leising, BCI-H0000071-72 (Aug. 28, 2007) ("Today's USD libors have come out and they look too low to me.").

[30]  Barclays DOJ SOF, *supra* note 1 ¶ 45.

sent an internal email stating that USD Libor contributors, including Barclays, were submitting "false and dishonest" submissions.[31]

52.     On March 5, 2008, the FSA asked Barclays what it was paying for funding in certain currencies.  A Barclays manager stated internally that he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to Libor.  A Barclays Libor submitter agreed that if he responded with "the honest truth," it might open a "can of worms."  Barclays responded to the FSA that it was paying for one-year USD at Libor "flat," which was untrue.[32]

53.     The UBS settlement documents revealed an April 10, 2008 electronic chat in which a UBS derivatives trader in London stated to a senior manager, "if we are [issuing commercial paper] at 2.81% and that is 3m libor +10 . . . why aren't we putting our 3m rate in at 2.81% for libors[?]."  The senior manager responded, "we should," to which the trader replied, "but then [Group Treasury] will rip our boys a new one for being the highest bank in the poll." [33]

54.     On April 11, 2008, a Barclays employee told an employee of the New York Federal Reserve that "we just fit in with the rest of the crowd . . . we know we're not posting um, an honest LIBOR."[34]  The Barclays employee also said he was aware of Libor panel banks putting in USD Libor submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[35]  He said that Barclays could

---

[31]  *Id.*

[32]  *Id.*  ¶ 46.

[33]  UBS DOJ SOF, *supra* note 8 ¶ 110; UBS CFTC Order, *supra* note 2, at 46-47.

[34]     N.Y. Fed. Reserve Bank, Unofficial Transcript, ID09274211 at 6 (Apr. 11, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/April_11_2008_transcript.pdf.

[35]  *Id.* at 7.

not borrow money at the rates submitted by other Libor panel banks and that "if we can't borrow money at that rate, then no one else could really . . . . I mean we . . . speak to everyone that everyone else does so, um, yeah, it's quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[36]

55.     On October 10, 2008, a Barclays employee privately reported to the New York Federal Reserve Bank that its USD Libor submissions were "unrealistic."[37]   On October 24, 2008, another Barclays employee privately reported to the New York Fed that USD Libor rates were "absolute rubbish," citing submissions by Deutsche Bank as being too low.  The employee said that he was aware of banks that were making Libor submissions that were below what they actually paid in comparable transactions:  "[R]ecently you've had certain banks who I know have been paying 25 basis points over where they've set their LIBORs . . . just the other day there was one bank who was paying 3.75, he sets his LIBOR at 3.70."[38]  Publicly, however, Barclays, the BBA, and other Libor Panel Defendants continued to falsely represent that Libor was based on accurate and honest submissions.

56.     UBS also disclosed concerted action among the Libor panel banks.  Through at least 2009, traders at UBS communicated with traders at other Libor panel banks to manipulate Libor.  By way of example, in a July 22, 2009 electronic chat, a UBS trader and a trader at another bank discussed how to execute the scheme while avoiding detection:

> Trader-1:     11th Aug is the big date . . . i still have lots of 6m fixings till the 10th
>
> . . . .

---

[36]  *Id.* at 16.

[37]  N.Y. Fed. Reserve Bank, Unofficial Transcript, BARC-MAY6-000091-97 at 95 (Oct. 10, 2008), *available at* http://s3.documentcloud.org/documents/399152/new-york-fed-documents-on-barclays.pdf.

[38]  N.Y. Fed. Reserve Bank, Unofficial Transcript, BARC-MAY6-000098-100 at 98, 100 (Oct. 24, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/October_24_2008_transcript.pdf.

Broker-A1:   if you drop your 6m dramatically on the 11th mate, it will look v fishy, especially if [Bank D] and [Bank B] go with you.  I'd be v careful how you play it, there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you.

Trader-1:   don't worry will stagger the drops . . . ie 5bp then 5bp

Broker-A1:   ok mate, don't want you getting into sh it

Trader-1:   us then [Bank B] then [Bank D] then [Bank B] then [Bank D]

Broker-A1:   great the plan is hatched and sounds sensible.[39]

57.    In its settlement, RBS admitted that between March 9 and March 18, 2010, RBS deliberately made USD Libor submissions that sought to gain advantage in the pricing of large, forthcoming floating rate transactions.  One RBS Libor submitter commented that he "wanted to keep [USD LIBORs] down because of some fixes."  Another RBS submitter confirmed:  "[W]e do have some big fixes in London so suits for low libors."  The FSA found that "RBS's USD LIBOR submissions stayed low during this period" and "went up after the last large transaction fixed."[40]  The FSA also found that RBS had no "systems, controls or policies governing the procedure for making LIBOR submissions"—systems and controls that would have prevented this type of wrongful conduct—until March 2011.[41]

58.    The Rabobank settlement reveals similar misconduct.  The CFTC determined:

From at least mid-2005 through early 2011, Rabobank traders engaged in hundreds of manipulative acts undermining the integrity of U.S. Dollar and Yen LIBOR, Euribor and, to a lesser extent, Sterling LIBOR.  These violations took various forms [including that] Rabobank traders, some of whom doubled as LIBOR and Euribor submitters, regularly made and accommodated their fellow

---

[39] UBS DOJ SOF, *supra* note 8 ¶ 68.

[40] RBS FSA Final Notice, *supra* note 3 ¶ 74.

[41] *Id.* ¶ 78.

traders' requests to make favorable rate submissions to benefit their trading positions through attempts to manipulate U.S. Dollar Libor and Yen LIBOR and Euribor.[42]

The DOJ made the same finding.[43]   The CFTC further found that Rabobank ignored the obvious conflicts of interest it created by assigning traders with trading positions tied to Libor to serve as Rabobank's Libor submitters.   "Submitters were improperly left to choose between their responsibility to make an honest assessment of borrowing costs and their desire to maximize the profitability of their trading positions.  Here, Rabobank's submitters often resolved the conflict in favor of profit."[44]

59.   Rabobank's settlement illustrates the collusion that occurred between banks. Until at least October 2008, for example, a Rabobank Yen Libor submitter regularly communicated with a submitter at another panel bank about the rates that each would submit for Yen Libor.  In one such conversation, on July 19, 2007, the outside submitter wrote:  "mrng beautiful. . . . if u can would love a low fixing in 3s libor today. . . .[0].77 if poss but just no higher than yest!!"  The Rabobank submitter replied:  "no prob."[45]  On March 19, 2008, the Rabobank submitter wrote that another Rabobank Yen Libor trader "needs a high 6m libor if u can help skip—asked me to set 1.10!"  The outside trader replied:  "oops by 6s is 1.15!!!," "he'll

---

[42]   Press Release, *Rabobank to Pay $475 Million Penalty to Settle Manipulation and False Reporting Charges Related to LIBOR and Euribor*, CFTC (Oct. 29, 2013), *available at* www.cftc.gov/PressRoom/PressReleases/pr6752-13.

[43]   Rabobank DOJ SOF, *supra* note 4 ¶ 15.

[44]   Press Release, *Rabobank to Pay $475 Million*, supra note 42.

[45]   *In the Matter of Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, CFTC Docket No. 14-02, Order Instituting Proceedings pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions ("Rabobank CFTC Order") at 23 (Oct. 29, 2013), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfrabobank102913.pdf.

love me."[46]  On September 25, 2008, the outside trader wrote:  "where r u pitching 6 s libor . . . got a fixing."  The Rabobank submitter responded:  "where would you like me to set it mate?"  The outside trader responded:  "i need a low one. . . anything arnd 1 pc would be ok."[47]  The same Rabobank submitter also colluded with an outside derivatives broker, fixing submissions to benefit the derivatives broker's clients, which included UBS.  Discussing one fix, the Rabobank submitter commented:  "You know, scratch my back, yeah, and all," and the derivatives broker replied:  "Yeah oh definitely, yeah, play the rules."[48]  As the Rabobank submitter now admits, there was "deffinite [sic] manipulation . . . i always used to ask if anyone needed a favour and vice versa . . . a little unethical but always helps to have friends in mrkt."[49]

**E.    Evidence of Wrongdoing by Other Libor Panel Defendants**

60.    The Libor quotes by Deutsche Bank, Credit Suisse, Bank of America, Citibank, and JPMorgan possess characteristics similar to—and in some cases more questionable than—those of Barclays, UBS, and RBS, thus supporting the conclusion that they too made false submissions.

61.    The Eurodollar Deposit Rate (EDDR) is published by the U.S. Federal Reserve and is compiled from the rates at which banks in the London Eurodollar money market bid on funds—i.e., the rates at which they seek to borrow U.S. dollars from each other.  As with Libor, the EDDR is computed based on submissions by a panel of banks, although the EDDR panel is much larger.  While it is possible that on particular days the risk profile of the two panels (Libor and EDDR) may vary, prior to August 2007, the two rates were, on average, very close together.

---

[46]    Rabobank    DOJ    SOF    ¶    78    (Oct.    29,    2013),    *available    at* http://www.justice.gov/iso/opa/resources/645201310298755805528.pdf.

[47] Rabobank CFTC Order, *supra* note 45, at 24.

[48] Rabobank CFTC Order, *supra* note 45, at 22.

[49] Rabobank DOJ SOF ¶ 80.

Indeed, from January 4, 2000 to August 8, 2007, the average spread of Libor over the EDDR ask rate was 0.02%. Between August 9, 2007 and June 30, 2010, however, the average spread increased to -0.28%, as shown in the following graph. On certain dates within that time period, the spread grew to -1.50% or more.



**Spread of 3 Month USD LIBOR over the 3 Month EuroDollar Deposit Ask Rate**
January 2000 -- April 2013

Data Source: Bloomberg.
Notes: The spread is calculated as 3 month USD LIBOR minus 3 month EuroDollar Deposit Ask Rate.

62.     The table below summarizes the average spreads of Barclays, UBS, RBS, Deutche Bank, Credit Suisse, BofA, Citibank, and JPMorgan's quotes with respect to the EDDR for different time periods. During the first time period, 2002 to 2006, the spreads between the banks' quotes with respect to EDDR varied between 0.01% and 0.03%. With the advent of the financial crisis in 2007 until the middle of 2010, the spreads not only turned negative, but were also significantly inverted with values ranging from -0.24% to -0.33% on the average. After that

period and through the end of 2012, though spreads continued negative, they were reduced in size and varied from -0.02% to -0.09%.

**Average Spreads between 3 Month USD LIBOR Quotes over the Eurodollar Deposit Rate Ask Price**

| Bank | 1/1/02 - 12/31/04 | 1/1/05 - 7/31/06 | 8/1/06 - 8/8/07 | 8/9/07 - 6/30/10 | 7/1/10 - 12/31/12 |
|---|---|---|---|---|---|
| Bank of America | 0.02% | 0.02% | 0.01% | -0.29% | -0.05% |
| Barclays Bank plc | 0.02% | 0.02% | 0.01% | -0.24% | -0.07% |
| Citibank NA | 0.02% | 0.01% | 0.01% | -0.31% | -0.06% |
| Credit Suisse | 0.02% | 0.02% | 0.01% | -0.26% | -0.06% |
| Deutsche Bank AG | 0.02% | 0.01% | 0.01% | -0.30% | -0.08% |
| JP Morgan Chase | 0.03% | 0.02% | 0.01% | -0.33% | -0.09% |
| The Royal Bank of Scotland Group | 0.03% | 0.01% | 0.00% | -0.25% | -0.02% |
| UBS AG | 0.03% | 0.02% | 0.01% | -0.28% | -0.07% |

Data Source: Bloomberg.

Note: All figures in percentage points. "USD LIBOR" denotes the bank's 3 month USD LIBOR quote for that day, and "Eurodollar Deposit Rate" denotes the 3 month Eurodollar Deposit Rate ask price. The spread is computed as 3 month USD LIBOR minus the ask price of the 3 month Eurodollar Deposit Rate.

      63.    Within the second half of 2008, there were days in which Defendants reported Libor quotes at or below 200 basis points from the comparable EDDR.  On both September 30 and October 1, Bank of America quoted Libor at 4% while the EDDR was 6%, a difference of -2%.  Spreads are even more negative for Citibank, which submitted a Libor quote that was 2.10% lower than EDDR on October 1, 2.05% lower on September 30, and 2% lower on October 2.  The spreads for JPMorgan and UBS were also negative over this time period.  For JPMorgan, the spread was -2.10% on September 30, -2.05% on October 6, and -2.02% on both October 1 and 2, while UBS presented spreads of -2% on September 30 and -1.9% on October 1.  Barclays, which has already admitted wrongdoing, presented the smallest spreads, but its Libor quotes were still significantly lower than EDDR.  These spreads are shown in the following table.

**3 Month USD LIBOR Quotes, Eurodollar Deposit Rate (Ask) and Resulting Spread for Each bank on Selected Days**

| | 9/30/2008 | | | 10/1/2008 | | | 9/22/2008 | | | 9/23/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| Bank of America | 4 | 6.00 | -2.00 | 4 | 6.00 | -2.00 | 3.1 | 5.00 | -1.90 | 3.15 | 5.00 | -1.85 |

| | 10/31/2008 | | | 9/18/2008 | | | 9/19/2008 | | | 11/3/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| Barclays Bank plc | 3.2 | 4.50 | -1.30 | 3.75 | 5.00 | -1.25 | 3.75 | 5.00 | -1.25 | 3 | 4.25 | -1.25 |

| | 10/1/2008 | | | 9/30/2008 | | | 10/2/2008 | | | 10/3/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| Citibank NA | 3.9 | 6.00 | -2.10 | 3.95 | 6.00 | -2.05 | 4 | 6.00 | -2.00 | 4.02 | 6.00 | -1.98 |

| | 9/18/2008 | | | 9/19/2008 | | | 9/22/2008 | | | 10/2/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| Credit Suisse | 3.25 | 5.00 | -1.75 | 3.25 | 5.00 | -1.75 | 3.3 | 5.00 | -1.70 | 4.4 | 6.00 | -1.60 |

| | 10/3/2008 | | | 9/30/2008 | | | 9/19/2008 | | | 10/1/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| Deutsche Bank AG | 4.05 | 6.00 | -1.95 | 4.15 | 6.00 | -1.85 | 3.2 | 5.00 | -1.80 | 4.2 | 6.00 | -1.80 |

| | 9/30/2008 | | | 10/6/2008 | | | 10/1/2008 | | | 10/2/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| JP Morgan Chase | 3.9 | 6.00 | -2.10 | 3.95 | 6.00 | -2.05 | 3.98 | 6.00 | -2.02 | 3.98 | 6.00 | -2.02 |

| | 9/18/2008 | | | 9/22/2008 | | | 9/19/2008 | | | 9/23/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| The Royal Bank of Scotland Group | 3.16 | 5.00 | -1.84 | 3.18 | 5.00 | -1.82 | 3.2 | 5.00 | -1.80 | 3.2 | 5.00 | -1.80 |

| | 9/30/2008 | | | 10/1/2008 | | | 10/2/2008 | | | 9/22/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread | LIBOR | ED(Ask) | Spread |
| UBS AG | 4 | 6.00 | -2.00 | 4.1 | 6.00 | -1.90 | 4.15 | 6.00 | -1.85 | 3.18 | 5.00 | -1.82 |

Data Source: Bloomberg.

Note: All figures in percentage points. "USD LIBOR" denotes the bank's 3 month USD LIBOR quote for that day, and "ED(Ask)" denotes the 3 month Eurodollar Deposit Rate ask price. The spread is computed as 3 month USD LIBOR minus the ask price of the 3 month Eurodollar Deposit Rate.

64.     Defendants managed to mask their wrongful conduct by claiming that the EDDR-Libor spread was the product of market conditions and structural differences in how the rates were calculated. For example, JPMorgan insisted:

- "[The] Libor panels are defined and limited to a relatively small number [of banks], while just about any major bank in the world can try to raise funds in the [EDDR] market. The Libor panelists generally constitute some of the best known and best capitalized banks in the world. . . . [I]t seems plausible the BBA panel banks could enjoy an advantage in credit costs. . . . If the BBA Libor panel does represent a collection of banks with better than average funding, it would be more likely that more [EDDR] outliers would represent high funding cost institutions, and therefore tend to pull the [EDDR] number above the BBA Libor level."

- "[The disparity] may also have a lot to do with the shifting composition of the market. . . . Libor was at the high-end of the traded deposit range immediately prior to the Bear Stearns crisis in mid-March [2008] because the funding markets were under stress and only a few of the strongest banks could borrow in the three-month tenor . . . .   After the rescue, market conditions improved

and many weaker institutions were willing to pay significant yields above Libor in order to secure three-month funding and as a result BBA Libor shifted to the low end of the range." [50]

Of course, the ongoing criminal and regulatory investigations and settlements to date have proven these explanations to be false.

65.     The disparity between Libor submissions and credit default swap (CDS) spreads also grew during the relevant period.  CDS spreads imply the market's perception of a company's likelihood of default.  Thus, if higher CDS spreads for a particular bank reflect a higher probability of default, then the bank would be expected to have higher borrowing costs, and it would be expected to report a higher Libor quote.  As shown below, however, Defendants' submissions did not track their CDS spreads.

66.     The figure below compares the CDS spreads to the Libor submissions of Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, BofA, Citibank, and JPMorgan for the period of August 9, 2007 through June 30, 2010.  Instances in which a bank's CDS spread is higher than the median while its 3-month Libor quote is lower than the median are represented in black. As is clearly illustrated, noticeable portions of the Libor submissions for each of the eight banks fell below the median Libor quote for the day, while at the same time their CDS spreads fell above the median CDS spread for the same day.  This is true for over 80% of Citibank's submissions, about 40% of Bank of America's submissions, about 30% of UBS's submissions, a little less than 30% of RBS's and JPMorgan's submissions, and 20% of Deutsche Bank's and Barclays' submissions.

---

[50]  Ex. 2, Terry Belton, *et al.*, *The Outlook for Libor*, JPMorgan, at 4 (May 16, 2008).





Intraday Rank Ordering:  3 Month USD LIBOR Quotes and Credit Default Swaps
8/9/2007 - 6/30/2010

■ USD LIBOR < Median & CDS >= Median    ☐ USD LIBOR < Median (>=) & CDS < Median (>= )    ☒ USD LIBOR >= Median & CDS < Median

Data Source: USD LIBOR data from Bloomberg; Credit Default Swap (CDS) data from CMA, starting on 8/9/2007.

Notes: Intraday ordering of 3 Month USD LIBOR quotes and respective CDS Spreads. On each given day, banks USD LIBOR quotes are ordered from highest to lowest, and classified into two groups:  above or equal, and below the median USD LIBOR quote for that day, among the same group of banks.  Similar ordering is performed for the available CDS spreads for the same group of banks conditional on data availability, classifying them into above or equal and below the median CDS spread on that day, within the same group.  For each bank, results are organized in three groups: USD LIBOR Quote Below Median & CDS Above or Equal Median (black), USD LIBOR Quote Above or Equal  Median & CDS Above or Equal Median together with USD LIBOR Quote Below Median & CDS Below Median (dotted), and USD LIBOR Quote Above or Equal  Median & CDS Below Median (striped).  The CDS data used are for the banks' one year senior debt CDS contracts in USD.

67.    For some banks, these patterns are even more noticeable between July 1, 2008 and December 31, 2008.  During this period, Citibank's percentage deviation goes up to almost 90%, with about 65% for both JPMorgan and Bank of America, as shown in the following figure.



**Intraday Rank Ordering: 3 Month USD LIBOR Quotes and Credit Default Swaps**
**7/1/2008 - 12/31/2008**

Data Source: USD LIBOR data from Bloomberg; Credit Default Swap (CDS) data from CMA, starting on 7/1/2008.

Notes: Intraday ordering of 3 Month USD LIBOR quotes and respective CDS Spreads. On each given day, banks USD LIBOR quotes are ordered from highest to lowest, and classified into two groups: above or equal, and below the median USD LIBOR quote for that day, among the same group of banks. Similar ordering is performed for the available CDS spreads for the same group of banks conditional on data availability, classifying them into above or equal and below the median CDS spread on that day, within the same group. For each bank, results are organized in three groups: USD LIBOR Quote Below Median & CDS Above or Equal Median (black), USD LIBOR Quote Above or Equal Median & CDS Above or Equal Median together with USD LIBOR Quote Below Median & CDS Below Median (dotted), and USD LIBOR Quote Above or Equal Median & CDS Below Median (striped). The CDS data used are for the banks' one year senior debt CDS contracts in USD

68.     The significance of the CDS spread data is underscored by comparison to the period of August 1, 2006 through August 8, 2007, when the vast majority of the banks' submissions are characterized by Libor quote above median and CDS spread above median, or Libor quote below median and CDS spread below median.  For example, during this period, less than 10% of Citibank's Libor quotes fell below the median on the same day its CDS spread was above the median.  The same was true for about 1% of Barclays' quotes, 2% of RBS's quotes, 3% of JPMorgan's quotes, 5% of UBS's quotes, and 12% of BofA's quotes.

69.    The CDS spread analysis demonstrates that Defendants' Libor submissions were particularly striking on days in which they settled large swap positions with Fannie Mae.  To take just a few examples:

- On September 18, 2008, JPMorgan submitted the lowest of the Libor panel quotes at 3.0, while its CDS spread ranked at the median of the Libor panel banks for that day.  Fannie Mae sustained $3.9 million in damages on swaps with JPMorgan settled the same day.

- On September 23, 2008, Bank of America submitted the second lowest of the Libor panel quotes at 3.15, while its CDS spread was above the median for that day.  Fannie Mae sustained $9.8 million in damages on swaps with BofA settled the same day.

- On October 2, 2008, Citibank submitted the lowest of the Libor panel quotes at 4.0, while its CDS spread was the highest of the Libor panel banks for that day.  Fannie Mae sustained $5.3 million in damages on swaps with Citibank settled the same day.

- On October 23, 2008, Credit Suisse's Libor quote decreased five basis points from the prior day, even as its CDS spread increased by 7.44 points, or 6.27%. Fannie Mae sustained $3.1 million in damages on swaps with Credit Suisse settled the same day.

- On October 27, 2008, Citibank submitted the fourth lowest of the Libor panel quotes at 3.4, while its CDS spread was the highest of the Libor panel banks for that day.  Notably, Citibank's Libor quote was down 1.45% from the prior day, while its CDS spread was up 2.68% from the prior day. Fannie Mae sustained $2.6 million in damages on swaps with Citibank settled the same day.

- Between November 20 and December 2, 2008, Deutsche Bank submitted a Libor quote of 2.2 each day, even as other Libor panel banks exhibited variability.  Deutsche Bank's submission of 2.2 on December 2 is particularly remarkable given that its CDS spread on December 2 increased by 9.07 points, or 8.05%, over the previous day.  Fannie Mae sustained damages of $4.7 million on swaps with Deutsche Bank settled on November 6, 2008, and it sustained damages of $4 million on swaps settled on December 3, 2008.

70.    Just as with the EDDR spreads, Defendants and financial analysts vocally insisted that the credit default swap spread disparity was driven by the economic crisis, not manipulation. Deutsche Bank, for example, posited in a May 2008 analyst report that Libor had experienced a

"structural breakdown" in the financial crisis and had "developed different sensitivity to fundamental market risks (liquidity and credit)" than the swap market.[51]   The government investigations and settlements have made clear that the divergence between Libor and CDS spreads was caused by false Libor submissions.

71.     In light of the statistical parallels between the submissions of Deutsche Bank, Credit Suisse, Bank of America, Citibank, and JPMorgan, on the one hand, and admitted-manipulators Barclays, UBS, and RBS on the other, it is not surprising that the scope of the Libor scandal continues to expand.

72.     According to internal documents provided to regulators and reviewed by *The Wall Street Journal*, Deutsche Bank "painstakingly constructed a string of trades in hopes of profiting from small changes in various rates" and, as of September 30, 2008, calculated that it could gain or lose as much as €68 million for each basis point of change in the spread between Libor and other rates.  A former Federal Reserve examiner said the bets represented "extremely large risk" for Deutsche Bank.  The same former employee who provided documents told regulators that some employees expressed concerns about the risks of Deutsche Bank's interest rate bets, but that Deutsche Bank officials dismissed those concerns because the bank could influence the rates on which they were betting.[52]   Subsequent to these revelations, Deutsche Bank suspended or dismissed seven employees involved in setting benchmark rates and has increased its litigation reserve to €2.4 billion.[53] Among the dismissed employees is former trader Christian Bittar, who is under investigation.[54]

---

[51]   Ex. 3, Aleksandar Kocic & Lei Chen, *US Fixed Income Weekly, Derivatives*, Deutsche Bank, at 8-9 (May 9, 2008).

[52]   Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J.  (Jan. 10, 2013).

[53]   Nicholas Comfort, *Deutsche Bank Seeks to Avoid Law Suits with Board Changes*, Bloomberg (May 21, 2013); Nicholas Comfort, *Deutsche Bank Cuts 2012 profit on Litigation Reserves*, Bloomberg (May 20, 2013).

73.     On June 18, 2013, the United Kingdom's Serious Fraud Office charged former UBS and Citigroup trader Tom Hayes with eight counts of "conspiring to defraud" in an attempt to manipulate Libor.  The charges against Mr. Hayes claim that he conspired with employees of eight banks, including JPMorgan, Deutsche Bank, and RBS, to "dishonestly seek[] to manipulate [Libor] . . . with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another."[55]

74.     In January 2013, Mr. Hayes sent a text message to the *Wall Street Journal* that said, "this goes much higher than me."  Indeed, that publication has reported that documents released in connection with the UBS settlement "indicated that Mr. Hayes's superiors were aware of his alleged tactics" and that "[w]hen Mr. Hayes jumped to Citigroup, senior executives signed off on a plan for the bank to join a Tokyo benchmark rate that Mr. Hayes and his boss soon allegedly tried to manipulate."[56]  The *Wall Street Journal* also reported that, just three days after he was fired by Citigroup for trying to manipulate benchmark rates, Mr. Hayes wrote a letter to a Citigroup human-resources executive that said:  "My actions were entirely consistent with those of others at senior levels . . . .  [T]he senior management at [Citigroup Japan] were aware of my actions."[57]

---

[54]   Gavin Finch & Liam Vaughan, *Fired Deutsche Bank Trader Loses $53 Million*, Bloomberg (Jan. 24, 2013); Sreeja VN, *Libor Scandal Update*, Int'l Bus. Times (June 7, 2013).

[55]   David Enrich, *Libor Case Ensnares More Banks*, *supra* note 5); David Enrich, *Former Trader Is Charged in U.K. Libor Probe*, Wall St. J. (June 18, 2013).

[56]   David Enrich, *Fresh Charges Readied in Rate-Rigging Case*, Wall St. J. (June 17, 2013).

[57]   David Enrich & Atsuko Fukase, *Libor Rate-Probe Spotlight Shines on Higher-Ups at Citigroup, Other Banks*, Wall St. J. (Aug. 28, 2013).

**F.      The BBA's Role in Libor Suppression**

75.      During the relevant time period, the BBA was governed by a board of member banks that met four times each year.  The board was composed of senior executives from twelve banks, including Barclays, Citibank, Deutsche Bank, JPMorgan, and RBS.

76.      Until 2010, the BBA's Foreign Exchange and Money Markets (FX & MM) Committee had sole responsibility for all aspects of the functioning and development of Libor and was an active participant in its wrongful and fraudulent suppression.

77.      The FX & MM Committee, comprised of thirteen "active market practitioners,"[58] was, on information and belief, significantly conflicted.  Although the BBA does not disclose the names of the members of the FX & MM Committee, UBS and RBS have both admitted that they had representatives on it.  The chair and two deputy chairs of the FX & MM Committee were also representatives from the panel banks.[59]  On information and belief, other Libor Panel Defendants also served on the FX & MM Committee.

78.      On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that "LIBORs are being set lower than where they ought to be."[60]  The Barclays manager explained that the Libor panel banks were submitting rates that were "too low" because "banks are afraid to stick their heads above the parapet and post higher numbers . . . .  You get shot at."[61]  The Barclays manager specifically identified certain other Libor Panel Defendants that she believed were submitting Libor rates lower than where those banks could actually get funds.  On

---

[58]  BBA, Understanding BBA Libor, at 1 (May 27, 2010), *available at* http://www.bbalibor.com/news-releases/understanding-bba-libor.

[59]  BBA, *LIBOR Governance and Scrutiny:  Proposals Agreed by the FX & MM Committee* § 1.11, *available at* www.bba.org.uk/download/7516 (Nov. 17, 2008).

[60]  Barclays DOJ SOF, *supra* note 1 ¶ 43.

[61]  *Id.*

information and belief, neither the BBA nor the FX & MM Committee took any steps to address these concerns.   To the contrary, they went to great lengths to conceal and discredit any suggestion of wrongdoing.

79.    During a six-month period in 2008, Thomson Reuters reportedly alerted the chair of the FX & MM Committee on a weekly basis that the Libor process was being distorted.[62]  The chair reportedly told Thomson Reuters that he would investigate its concerns, but no meaningful or legitimate investigation was ever undertaken.

80.    After its formal meeting on May 30, 2008, the BBA announced that it would be strengthening the oversight of Libor and that "the details will be published in due course."[63]  The BBA shared its proposed changes with the Bank of England, which internally concluded that the BBA's proposal was "wholly inadequate."[64]

81.    After issuing a final report in November 2008, BBA officials internally discussed the possibility of selling Libor or spinning it off into a wholly independent entity, but when BBA staffers pitched the idea to the Libor panel banks, they reportedly got the impression that the banks—which paid much of the BBA's bills through membership fees—wanted Libor kept in house so they could continue to influence it.  As a result, the idea ultimately was abandoned.[65]

82.    A DOJ investigation found that UBS's representative on the FX & MM Committee in 2009 knew of fraudulent and collusive conduct relating to the Euro Interbank Offered Rate ("Euribor") and, rather than acting on behalf of the BBA to stop the conduct,

---

[62]  Ian Pollock, *Libor:  BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC News (July 25, 2012).

[63]  Laurence Norman, *British banks say no changes to Libor panel*, Assoc. Press Fin. Wire (May 30, 2008).

[64]  Ex. 4, Bank of England Governor Mervyn King's written comment on email regarding results of BBA Libor review (May 30, 2008).

[65]  David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J. (Sept. 11, 2012).

participated in the submission of false information and directed UBS's Euribor submitter to "JUST BE CAREFUL DUDE."  The UBS submitter responded, "I agree shouldn't ve been talking about putting fixings for our positions on public chat."[66]

83.    On January 1, 2010, more than a year after learning that regulators were confidentially investigating Libor, the BBA modified its structure.  It created a new entity, Defendant BBA LIBOR, Ltd., to assume responsibility for the day-to-day running of the benchmark.  But the FX & MM Committee continued to oversee Libor, and despite this change in structure, the processes and procedures followed by the panel banks and the BBA in calculating and publishing Libor remained the same.

84.    In September 2012, an independent panel recommended that the BBA be stripped of its role in Libor rate setting, and in July 2013, the British Treasury announced that Libor would be supervised by stock exchange operator NYSE Euronext.

## V.  FRAUDULENT CONCEALMENT

85.    Before UBS's March 15, 2011 disclosure that it had received subpoenas from regulators, Fannie Mae had not discovered, and under the circumstances reasonably should not have been expected to discover, that Defendants had engaged in misconduct, including fraud and conspiracy, that caused Libor to be artificially depressed.  Before that time, Defendants actively and affirmatively misled the market and Fannie Mae by attributing Libor's behavior to "legitimate" claims of market dislocation rather than acknowledging their illegitimate and illegal behavior.  The following paragraphs describe these events and circumstances.

86.    The global financial crisis of 2007-2009 is considered by many economists to be the worst financial crisis since the Great Depression of the 1930s.  It began as early as February

---

[66] UBS DOJ SOF, *supra* note 8 ¶¶ 85-86.

2007, when the Federal Home Loan Mortgage Corporation ("Freddie Mac") announced that it would no longer buy the most risky subprime mortgages and mortgage-related securities.  On April 2, 2007, New Century Financial Corporation, a leading subprime mortgage lender, filed for Chapter 11 bankruptcy protection.  On January 11, 2008, Bank of America announced that it would purchase Countrywide Financial in an all-stock transaction worth approximately $4 billion.  On February 13, 2008, President Bush signed the Economic Stimulus Act of 2008 into law.  Then, on March 24, 2008, the Federal Reserve Bank of New York announced that it would provide financing to facilitate JPMorgan's bailout of Bear Stearns.  The markets were in turmoil, and the economy was plunged into a deep recession.

87.     On April 18, 2008, after the BBA announced that it would conduct a review of the Libor-setting process, the three-month USD Libor "rose the most since the start of the global credit squeeze[.]"[67]  Shortly thereafter, BBA director John Ewan specifically denied that the rise in Libor bore any relation to the heightened scrutiny:

> Ewan countered reports earlier this week suggesting the BBA would eject banks from Libor-setting panels if they are found to have under-reported rates.  "Just about every single contributor to the rate rang me and asked if this was true—can the BBA throw people off the panel?  I assured them this wasn't the case," Ewan said. . . . *That makes it unlikely under-reporting banks suddenly offered more realistic reports this week, Ewan said.  Instead, he said the jump in Libor rates may have more to do with a major sell-off in the Eurodollar futures market.* *"We're pretty confident that this has been an effect of the market moving," Ewan said.  "It's another stage in the evolution of this extremely strained market that we've been seeing since August last year*."[68]

---

[67]  Agnes Lovasz, *Dollar Money-Market Rate Advances Most Since August*, Bloomberg (Apr. 18, 2008).

[68]  Alistair Barr, *Libor rate jumps again as banking group accelerates reviews*, Market Watch (Apr. 18, 2008) (emphasis added).

88.    Numerous analyst reports by the Libor Panel Defendants that Fannie Mae received were similarly quick to blame the rise on market forces, rather than on any mispricing of Libor submissions.  For example:

- On April 18, 2008, Deutsche Bank posited that "there is relatively weak price discovery in the USD LIBOR market.  Given that US banks are increasingly financing themselves with FHLB advances and the Fed facilities, they have less need for the London interbank market.  With the largest participants out of the market, liquidity has been thin and market prices are easily pushed around by rising demand for USD borrowing."[69]

- A JPMorgan report similarly commented that "[the] fact that implied USD Libor from GBP/USD and EUR/USD forwards is significantly higher than actual Libor fixings is without a doubt an indication of funding pressures . . . [but], in and of itself, . . . does not imply incorrect fixings. . . .  One characteristic of periods of financial sector stress is that the usual assumption of homogeneity of participants ceases to be true at least to a degree."[70]

- A Deutsche Bank report suggested that "Libor has developed different sensitivity to fundamental market risks (liquidity and credit) together with [a] separate idiosyncratic component which has not been as strong in the past."[71]

- A UBS report commented that "we don't even know if contributing banks are mis-pricing Libor in the first place.  Libor could be simply responding to the rise in other market rates around the time of the BBA's announcement.  It's anyone's guess."[72]

- A Bank of America Global Rates Strategy report likewise purported to test and dismiss "the whiff of conspiracy theory" surrounding Libor.  The report posited that "[i]f there was a LIBOR conspiracy at work, we would see a chronic drop in OIS/LIBOR spreads on"—the 15th and 25th of each month—the dates on which swap agreements with Freddie Mac and Fannie Mae, respectively, set.  The article noted that there was no such drop:  "[I]f we compare the OIS/LIBOR spread on the day before and the day after, there is no evidence of bias. . . . Accordingly, on the days where it matters most, there

---

[69]  Ex. 5, Mustafa Chowdhury & Marcus Huie, *U.S. Fixed Income Weekly, Overview*, Deutsche Bank, at 4 (Apr. 18, 2008).

[70]  Ex. 6, Houston Frost, Kimberly L. Harano & Srini Ramaswamy, *US Fixed Income Strategy*, *Cross Sector Overview*, JPMorgan, at 3-4 (Apr. 18, 2008).

[71]  Ex. 3, Kocic & Chen, *U.S. Fixed Income Weekly, Derivatives*, *supra* note 51.

[72]  Ex. 7, William O'Donnell, *U.S. Rates Perspectives*, UBS Investment Research, at 3 (Apr. 25, 2008).

is no evidence that LIBOR has been steered to support the bank-dealers that are prominently featured in the panel."[73]

- On April 21, 2008, Jeffrey Rosenberg, head of credit strategy of Bank of America Securities, was quoted in a *Financial Times* piece arguing that the variations in Libor were simply a function of the way the BBA calculated Libor. He said the BBA approach "works when both overall bank risk is low and the dispersion of risks across banks is small . . . [which] is clearly not the case currently." The same article attributed unidentified "bankers" as saying it "***seems unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep Libor rates down***" and reported Dominic Konstam, head of interest rate strategy at Credit Suisse, as saying that "Banks are hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply."[74]

89.     Compounding the confusion, in early May 2008 the *Wall Street Journal* posited that Libor was actually *higher* than it should be. The *Journal* reported that Libor "remain[ed] unusually high compared with expected Federal Reserve interest rates, an indication that banks continue to hoard dollars." *The Wall Street Journal* explained that "Fed officials attribute the recent Libor rise to European banks' needing to borrow in dollars, because the pressure tends to slacken around midday in the U.S. when the European day ends" and described steps that the Fed was taking to "reduc[e] tensions in the Libor market."[75]

90.     Analyst reports published by the Libor Panel Defendants that Fannie Mae received were quick to endorse the concern that Libor was in fact too "high." For example:

- Credit Suisse's Sean Keane commented that "[t]he LIBORs are remaining sticky at higher levels than they should be."[76]

---

[73] Ex. 8, Michael Cloherty, *Global Rates Focus*, Bank of America, at 2 (May 15, 2008).

[74] Gillian Tett & Michael Mackenzie, *Doubts Over Libor Widen*, Fin. Times (Apr. 21, 2008) (emphasis added).

[75] Joellen Perry, Greg Ip & Carrick Mollenkamp, *Central Banks Ponder Dollar-Debt Rate*, Wall St. J. (May 2, 2008).

[76] Ex. 9, *Bloomberg* post by Sean Keane, Credit Suisse (May 1, 2008).

- JPMorgan's Terry Belton hypothesized that uncertainty about the panel banks' credit losses, "along with balance sheet constraints, [wa]s weighing on Libor, leaving many banks anxious about potential future losses" and driving up the Libor rate.[77]

- UBS's Lauren Cantor commented:  "The media can't seem to make up its mind:  last week LIBOR was being set artificially low by the banks (relative to funding levels); today the WSJ says LIBOR is set too high (relative to Fed Funds)."[78]

91.     In anticipation of the results of the BBA internal review, the Libor Panel Defendants weighed in with assurances that the BBA would find nothing wrong.  Fannie Mae received each of these assurances:

- Citigroup's Peter Ristine wrote in an email titled "In defense of Libor" that determining banks' "true funding costs . . . [has] been massively complicated by the central banks' liquidity measure[s], which are largely designed to reduce Libor.  With the interbank market freezing up almost completely at times, it's not inconceivable that banks don't know their 'true' cost of funds interbank."[79]

- Bank of America's Patrick Duthie likewise noted that "[t]he consensus seems to have adopted the view that LIBOR problems are primarily due to bank balance sheet constraints (and balance sheet unpredictability)."[80]

- JPMorgan's Terry Belton posited that "the Libor fixing process is not broken; BBA Libor broadly reflects the borrowing costs of top tier large banks. . . . The main limitations of Libor are due more to lack of liquidity rather than any bias in the fixing process."[81]

- Deutsche Bank's Mustafa Chowdhury commented that "there is little evidence that rate manipulation, if it exists, has been appreciably affecting the LIBOR fixing. . . . Collaboration among a large number of the survey banks to submit non-market-based quotes is also highly unlikely."[82]

---

[77] Ex. 2, Terry Belton, *et al.*, *The Outlook for Libor*, *supra* note 50, at 3.

[78] Ex. 10, *Bloomberg* post by Lauren Cantor, UBS (May 2, 2008).

[79] Ex. 11, *Bloomberg* post by Peter Ristine, Citigroup (May 14, 2008).

[80] Ex. 12, *Bloomberg* post by Patrick Duthie, Bank of America (May 16, 2008).

[81] Ex. 2, Terry Belton, *et al.*, *The Outlook for Libor*, *supra* note 50, at 1.

[82] Ex. 13, Mustafa Chowdhury, *et al.*, *Fixed Income Special Report, Repairing LIBOR* (May 27, 2008).

- Citigroup's Kal Vadasz wrote: "As is typical, much of what makes it into the press does not stand up to scrutiny. As I said in an earlier piece, Libor isn't perfect but it works."[83]

92. On May 29, 2008, and in response to an article published in *The Wall Street Journal*, JP Morgan stated in a Bloomberg post sent to several Fannie Mae personnel that "the article is inaccurate and the calculations in the article are flawed. We will be sending out a note later today on the subject."[84] In that subsequent note, JPMorgan's Terry Belton called the article "deeply flawed" and concluded that although "Libor has a number of shortcomings, we don't find evidence that it is biased too high or too low."[85]

93. Also on May 29, 2008, Reuters quoted a BBA spokesman as saying, "We have every confidence in the integrity of the BBA Libor-setting process and the accuracy of the figures it produces[.]"[86] Consistent with this representation, the BBA announced on May 30, 2008 that it would not "make changes to the body that sets the dollar rate" but that it would be strengthening the oversight of Libor and that "[t]he details will be published in due course."[87]

94. Details of the BBA's purportedly enhanced governance and oversight were announced on June 10, 2008 when the BBA published a release titled "Understanding the construction and operation of BBA LIBOR – strengthening for the future." The BBA claimed that this paper "represent[ed] the views of the Foreign Exchange and Money Markets

---

[83] Ex. 14, *Bloomberg* post by Kal Vadasz, Citigroup (May 30, 2008).

[84] Ex. 15, *Bloomberg* post by Marc Konigsberg, JP Morgan Securities (May 29, 2008).

[85] Ex. 16, *Bloomberg* post by Benjamin E. Kinney, JPMorgan Securities (May 29, 2008).

[86] Gavin Finch & Elliott Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008).

[87] Laurence Norman, *British banks say no changes to Libor panel*, Assoc. Press Fin. Wire (May 30, 2008).

Committee, many other members of the BBA and incorporates the overwhelming number of

informed comments that the BBA has received."  The paper stated:

- "Since its inception in 1985, BBA LIBOR has enjoyed a reputation for accuracy.  However, just as the credit crunch has led to stress in the markets, and the breakdown of longstanding correlations in the pricing of assets, as a barometer of these markets, it has also been stressed.   This has led to discussion of some of the BBA LIBOR currency fixes – particularly the Dollar fix – within the financial community.   This proper discussion *has overflowed into commentary in the media, and the BBA believes that it needs to correct a number of misunderstandings and misperceptions*."

- "US Dollar LIBOR is regarded as a benchmark rate at which non-domestic Dollars can be borrowed . . . .The dispersion of rates input by each bank is reflective of the credit conditions facing each bank on a daily basis.   For several years therefore the spread between the highest and lowest has been tight as the credit environment was benign.  *An increase in dispersion rates has occurred since August 2007 as a consequence both of the greater credit costs in the bank market since the start of the credit crunch and the lack of liquidity*."

- "Credit crunch effects have ebbed and flowed on several occasions during the past months which in turn impact the LIBOR fix as it does other indicators. . . . *These issues relating directly to the current environment will inevitably result in a volatility* that is today more than that experienced in benign conditions."

- "*The argument is sometimes made that the U.S. Dollar fixing MUST be too low, otherwise there is apparent arbitrage.  This is in fact not correct*.  It is simply that the market is no longer offering a cost free arbitrage between the FX swap and cash transactions."

- "Differences between the London Euro Dollar rate and the domestic U.S. Dollar rates are **a reflection of existing market conditions, not necessarily a distortion in benchmarks**." (emphasis in original)

The BBA review document further explained that it was incorporating a tight scrutiny

mechanism that would require any contribution discrepancies to be reviewed and justified.[88]

Fannie Mae was aware of the BBA representations regarding the validity of the USD Libor.

---

[88]   BBA, *Understanding the Construction and Operation of BBA LIBOR—Strengthening for the Future:  A Consultative Paper from the BBA* §§ 2.3, 2.4, 5.1, 6.8, 6.9, 7.3, 7.4, 8.7 (June 10, 2008) (emphasis added except where noted), *available at* http://www.bba.org.uk/media/article/bba-announces-steps-to-strengthen-libor.

95.     A June 16, 2008 article reported the results of the BBA's internal review.  "[T]he BBA said last week there will be tighter scrutiny of the rates contributed by banks setting the mechanism so any discrepancies in the rates must be justified by individual contributing banks."  The article quoted the BBA as saying "[t]hese changes will further strengthen BBA Libor and the confidence of its many users[.]"[89]

96.     Meanwhile, the economic crisis worsened for market participants generally and Fannie Mae specifically.  On July 11, 2008, the Federal Reserve Board authorized the Federal Reserve Bank of New York to lend to Fannie Mae and Freddie Mac.  Days later, on July 13, 2008, the U.S. Treasury announced a temporary increase in the credit lines of Fannie Mae and Freddie Mac and a temporary authorization for the Treasury to purchase equity in either government-sponsored enterprise if needed.  On July 15, 2008, the SEC issued an emergency order temporarily prohibiting naked short selling in the securities of Fannie Mae, Freddie Mac, and certain other entities.  Then, on July 30, 2008, President Bush signed into law the Housing and Economic Recovery Act of 2008, which established the Federal Housing Finance Agency (FHFA) to become conservator for Fannie Mae and Freddie Mac.

97.     On August 5, 2008, the BBA published another paper regarding its internal investigation.  This paper, called a "Feedback Statement," was a follow up to the BBA's June 10, 2008 publication and purported to address certain questions about Libor.[90]  The BBA described the purpose of the Feedback Statement as follows:

---

[89]  Aleksandrs Rozens, *BBA Retools Libor: Changes aimed at shoring up confidence in widely-used benchmark; the Fed didn't weigh in*, Investment Dealers Digest (June 16, 2008).

[90]     BBA, Libor Consultation Feedback Statement (Aug. 5, 2008), *available at* http://www.bba.org.uk/media/article/bba-libor-review-consultation-feedback-statement/latest-news.

In June 2008, after discussion with a wide cross-section of the market, the independent committee which oversees BBA LIBOR, the Foreign Exchange and Money Markets Committee ("FX & MM Committee"), published a consultation document . . . This document was part educative in that it discussed in some detail the construction of BBA LIBOR . . . The document also laid out in broad terms some proposals for strengthening the governance and scrutiny of BBA LIBOR, and asked users of the rates for their views on a number of possible developments. This feedback paper presents both the answers received to the questions in the consultation, and provides more detail on governance and scrutiny.  The BBA has received responses from a wide cross-section of entities in the market.  These include banks who currently contribute to the BBA LIBOR, rate users, public entities, and some umbrella organisations. . . . [91]

The BBA paper described some of its results as follows:

- "Respondents to the survey considered that BBA LIBOR is a fundamentally robust and accurate benchmark, with contributors inputting rates that they believe to reflect their future borrowing costs."

- "Furthermore, many respondents referred to the current poor market conditions as having an adverse effect on all benchmarks aggravated by the global shortage of US Dollars."

- "A number of responses noted that ***BBA LIBOR has been the subject of inaccurate and misconceived commentary in some areas of the media and that this needs to be addressed***.  The consultation process explores a number of options for demonstrating the accuracy of BBA LIBOR and ensuring it remains an appropriate benchmark . . . The BBA recognises that the need to ensure confidence in BBA LIBOR is crucial . . . "

- "**In conclusion, all contributing banks are confident that their submissions reflect their perception of their true costs of borrowing, at the time at which they submitted their rates**."  (emphasis in original)

- "Further, the Committee believes that current submissions are accurate and any potential discrepancies would be addressed by the introduction of enhanced governance and scrutiny procedures."[92]

Defendants all furnished information and responses that the BBA used for this publication.

---

[91] *Id.* §§ 1.1-1.4.

[92] *Id.* §§ 1.5, 2.4, 3.19, 4.8.

98.     An August 8, 2008 article reported that the BBA had "***reject[ed] the criticism on misreporting stating that there is no evidence of this***."[93]

99.     September 2008 saw the following dramatic events in the U.S. economy: on September 7, the FHFA placed Fannie Mae and Freddie Mac in government conservatorship; on September 15, Lehman Brothers filed for Chapter 11 bankruptcy protection; on September 16, the Federal Reserve Board authorized the Federal Reserve Bank of New York to lend up to $85 billion to American International Group; on September 17, the SEC announced a temporary emergency ban on short selling in the stocks of all companies in the financial sector; and on September 25, the Office of Thrift Supervision closed Washington Mutual.

100.    In October 2008, Congress passed and President Bush signed into law the Emergency Economic Stabilization Act of 2008, which established the $700 billion Troubled Asset Relief Program.  That same month, the International Monetary Fund (IMF), unaware of the fraud and manipulations of the Libor Panel Defendants, published a Global Financial Stability Report, which contained a detailed analysis of the financial crisis and proposed remedial policy measures.  Included in the IMF's detailed analysis was the following discussion of Libor:

> Although the integrity of the U.S. dollar LIBOR fixing process has been questioned by some market participants and the financial press, it appears that U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding.  A BBA proposal to introduce more aggressive scrutiny of individual bank contributions is still welcome, as it should improve the accuracy of the LIBOR calculation[.][94]

---

[93]  *BBA confirms no significant changes to LIBOR*, Banking Newslink (Aug. 8, 2008) (emphasis added).

[94]     Int'l Monetary Fund, *Global Stability Report* at 76 (Oct. 2008), *available at* http://www.imf.org/external/pubs/ft/gfsr/2008/02/pdf/text.pdf.

101.    In the midst of this turmoil, on November 17, 2008, the BBA published a report titled "LIBOR Governance and Scrutiny."[95]  As its name suggests, this report was the product of the prior internal review and request for comments described in the BBA's June and August 2008 publications.  The November report described, among other things, the BBA's plans for enhanced scrutiny and oversight of the Libor panel banks, including the following:

- "LIBOR contributors will be reviewed twice annually, typically in June and December."

- "Day-to-day monitoring of internal consistency of submissions as laid out will be carried out by the fixings team at Thomson Reuters and analysts at the BBA. . . . If a submitted rate triggers a query, Thomson Reuters will immediately contact the bank in question and ask them to confirm their rate. . . .  If, in the view of the LIBOR manager, a bank's submitted rate is aberrant or the bank's explanation for their submission is unsatisfactory, the LIBOR manager will inform the Fixings Sub-committee who will meet to consider the issue."[96]

102.    After the BBA announced the results of its internal review, questions about Libor effectively stopped.  None of the major news outlets—including *The Wall Street Journal*, *New York Times*, *Financial Times*, and *Bloomberg*—published anything suggesting that Libor might have been manipulated until at least March 2011, when UBS disclosed that it had received subpoenas from the CFTC and the DOJ in connection with investigations into Libor.

103.    This prolonged period of silence underscores that Fannie Mae had not discovered, and under the circumstances reasonably should not have been expected to discover, that Defendants had engaged in misconduct, including fraud and conspiracy, that caused Libor to be artificially low.

---

[95]    BBA, *LIBOR Governance and Scrutiny: Proposals agreed by the FX & MM Committee* (Nov. 17, 2008), *available at* http://www.bba.org.uk/media/article/libor-gets-enhanced-governance-and-scrutiny-procedures.

[96]    *Id.* §§ 1.9, 2.13-2.15

104.    Fannie Mae did not have access to information that could have revealed the Defendants' wrongful conduct.  Fannie Mae did not have access to the Defendants' actual costs of borrowing, it had no access to internal communications by the Defendants regarding their Libor submissions, it was not privy to communications between the Defendants and government regulators, and it did not have access to documents produced in connection with the confidential investigations or the internal documents regarding the BBA's purported internal review.

105.    Defendants' misconduct was, by its very nature, intentionally self-concealing. Defendants could not expect to suppress USD Libor or hide their own fragility if the general public knew that they were reporting artificially depressed USD Libor quotes.  Defendants' misrepresentations could only succeed if they prevented their counterparties and the public from knowing what they were doing.

106.    The admissions by Barclays, UBS, and RBS illustrate Defendants' extensive effort to conceal their fraudulent conduct.  For example, a UBS Libor submitter scolded a manager for internally transmitting in writing a request to manipulate a Libor submission; a UBS trader consciously sought to move Libor submissions in small increments over time to avoid detection; [97] a UBS derivatives desk manager instructed a Libor submitter to lie when interviewed by UBS attorneys investigating Libor manipulation;[98] Barclays managers instructed USD Libor submitters not to be "outliers";[99] RBS turned an institutional blind eye, declining to implement any controls over its Libor submissions processes even after becoming aware of

---

[97] UBS DOJ SOF, *supra* note 8 ¶ 38.

[98] UBS DOJ SOF, *supra* note 8 ¶ 39.

[99] Barclays DOJ SOF, *supra* note 1 ¶ 37.

serious weaknesses;[100] and Rabobank placed traders and Libor submitters in shared office space, so that requests to manipulate Libor could be made verbally.[101]  On information and belief, other Defendants engaged in similar conduct to cover up their wrongful acts regarding USD Libor. The evidence of such conduct is solely within the custody and control of the Defendants and/or government regulators.

107.    These and other communications among Defendants' employees only started to become available after 2011, as the result of investigations by government regulators and law enforcement, and are still continuing to emerge.  Accordingly, Fannie Mae neither could nor should have discovered Defendants' misconduct prior to at least March 2011.

## VI. CAUSES OF ACTION

### Count I:  Breach of Contract (Barclays)

108.    Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

109.    At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with Barclays, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate swap transactions with Barclays.[102]  The ISDA Master Agreement is accompanied by and includes a Schedule, a Credit Support Annex, and Confirmations.  The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

110.    By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, Barclays breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the

---

[100]   Final Notice of Settlement Between Financial Services Authority and RBS ¶ 78 (Feb. 6, 2013), *available at* http://www.fsa.gov.uk/static/pubs/final/rbs.pdf.

[101] Rabobank CFTC Order, *supra* note 45, at 2-3.

[102]   *See* Ex. 17 (relevant portions of Barclays ISDA).

ISDA Master Agreement.  Specifically, Barclays promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA.  In breach of this agreement, Barclays calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

111.    Barclays' actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring Barclays to "comply in all material respects with all applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit Support Annex (requiring Barclays to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

112.    Barclays also breached certain material representations that it made to Fannie Mae in the ISDA.  Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, Barclays represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[103]  From at least 2007 through 2010, this representation was not true because Barclays was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[104]

113.    As a result of Barclays' material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages.  Fannie Mae has also incurred, and is

---

[103]  ISDA § 3(b).

[104]  An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]"  *Id.* § 5(a)(ii).  Misrepresentations provide another Event of Default trigger.  *See id.* § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[105]

**Count II:  Breach of Contract (UBS)**

114.   Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

115.   At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with UBS, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate swap transactions with UBS.[106]  The ISDA Master Agreement is accompanied by and includes a Schedule, a Credit Support Annex, and Confirmations.  The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

116.   By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, UBS breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the ISDA Master Agreement.  Specifically, UBS promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA.  In breach of this agreement, UBS calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

117.   UBS's actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring UBS to "comply in all material respects with all applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit Support Annex

---

[105]   *See* ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

[106]   *See* Ex. 18 (relevant portions of UBS ISDA).

(requiring UBS to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

118.    UBS also breached certain material representations that it made to Fannie Mae in the ISDA.  Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, UBS represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[107]  From at least 2007 through 2010, this representation was not true because UBS was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[108]

119.    As a result of UBS's material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages.  Fannie Mae has also incurred, and is entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[109]

## Count III:  Breach of Contract (RBS)

120.    Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

121.    At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with RBS, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate swap transactions with RBS.[110]  The ISDA Master Agreement is accompanied by and includes a

---

[107]  ISDA § 3(b).

[108]  An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]"  *Id.* § 5(a)(ii). Misrepresentations provide another Event of Default trigger.  *See id.* § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

[109]  *See* ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

[110]  *See* Ex. 19 (relevant portions of RBS ISDA).

Schedule, a Credit Support Annex, and Confirmations.  The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

122.    By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, RBS breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the ISDA Master Agreement.  Specifically, RBS promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA.  In breach of this agreement, RBS calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

123.    RBS's actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring RBS to "comply in all material respects with all applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit Support Annex (requiring RBS to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

124.    RBS also breached certain material representations that it made to Fannie Mae in the ISDA.  Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, RBS represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[111]   From at least 2007 through 2010, this

---

[111]  ISDA § 3(b).

representation was not true because RBS was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[112]

125.    As a result of RBS's material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages.  Fannie Mae has also incurred, and is entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[113]

**Count IV:  Breach of Contract (Deutsche Bank)**

126.    Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

127.    At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with Deutsche Bank, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate swap transactions with Deutsche Bank.[114]  The ISDA Master Agreement is accompanied by and includes a Schedule, a Credit Support Annex, and Confirmations.  The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

128.    By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, Deutsche Bank breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the ISDA Master Agreement.  Specifically, Deutsche Bank promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in

---

[112]    An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]"  *Id.* § 5(a)(ii). Misrepresentations provide another Event of Default trigger.  *See id.* § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

[113]    *See* ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

[114]    *See* Ex. 20 (relevant portions of Deutsche Bank ISDA).

accordance with its good-faith compliance with the legitimate bidding process established by the BBA. In breach of this agreement, Deutsche Bank calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

129. Deutsche Bank's actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring Deutsche Bank to "comply in all material respects with all applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit Support Annex (requiring Deutsche Bank to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

130. Deutsche Bank also breached certain material representations that it made to Fannie Mae in the ISDA. Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, Deutsche Bank represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[115] From at least 2007 through 2010, this representation was not true because Deutsche Bank was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[116]

131. As a result of Deutsche Bank's material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages. Fannie Mae has also incurred, and is

---

[115] ISDA § 3(b).

[116] An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]" *Id.* § 5(a)(ii). Misrepresentations provide another Event of Default trigger. *See id.* § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[117]

**<u>Count V:  Breach of Contract (Credit Suisse)</u>**

132.    Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

133.    At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with Credit Suisse, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate swap transactions with Credit Suisse.[118]   The ISDA Master Agreement is accompanied by and includes a Schedule, a Credit Support Annex, and Confirmations.  The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

134.    By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, Credit Suisse breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the ISDA Master Agreement.  Specifically, Credit Suisse promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA.  In breach of this agreement, Credit Suisse calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

135.    Credit Suisse's actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring Credit Suisse to "comply in all material respects with all

---

[117]   *See* ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

[118]   *See* Ex. 21 (relevant portions of Credit Suisse ISDA).

applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit Support Annex (requiring Credit Suisse to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

136.    Credit Suisse also breached certain material representations that it made to Fannie Mae in the ISDA.  Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, Credit Suisse represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[119]  From at least 2007 through 2010, this representation was not true because Credit Suisse was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[120]

137.    As a result of Credit Suisse's material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages.  Fannie Mae has also incurred, and is entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[121]

**Count VI:  Breach of Contract (Bank of America)**

138.    Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

139.    At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with BofA, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate

---

[119]  ISDA § 3(b).

[120]  An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]"  Id. § 5(a)(ii). Misrepresentations provide another Event of Default trigger.  See id. § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

[121]  See ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

swap transactions with BofA.[122]   The ISDA Master Agreement is accompanied by and includes a Schedule, a Credit Support Annex, and Confirmations.   The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

140.   By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, BofA breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the ISDA Master Agreement.   Specifically, BofA promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA.   In breach of this agreement, BofA calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

141.   BofA's actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring BofA to "comply in all material respects with all applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit Support Annex (requiring BofA to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

142.   BofA also breached certain material representations that it made to Fannie Mae in the ISDA.   Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, BofA represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[123]   From at least 2007 through 2010, this

---

[122]   *See* Ex. 22 (relevant portions of BofA ISDA).

[123]   ISDA § 3(b).

representation was not true because BofA was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[124]

143.    As a result of BofA's material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages.  Fannie Mae has also incurred, and is entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[125]

**Count VII:  Breach of Contract (Citibank)**

144.    Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

145.    At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with Citibank, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate swap transactions with Citibank.[126]  The ISDA Master Agreement is accompanied by and includes a Schedule, a Credit Support Annex, and Confirmations.  The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

146.    By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, Citibank breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the ISDA Master Agreement.  Specifically, Citibank promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA.  In breach of

---

[124]   An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]"  *Id.* § 5(a)(ii).  Misrepresentations provide another Event of Default trigger.  *See id.* § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

[125]   *See* ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

[126]   *See* Ex. 23 (relevant portions of Citibank ISDA).

this agreement, Citibank calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

147.   Citibank's actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring Citibank to "comply in all material respects with all applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit Support Annex (requiring Citibank to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

148.   Citibank also breached certain material representations that it made to Fannie Mae in the ISDA.  Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, Citibank represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[127]  From at least 2007 through 2010, this representation was not true because Citibank was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[128]

149.   As a result of Citibank's material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages.  Fannie Mae has also incurred, and is

---

[127]  ISDA § 3(b).

[128]  An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]"  *Id.* § 5(a)(ii).  Misrepresentations provide another Event of Default trigger.  *See id.* § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[129]

## Count VIII:  Breach of Contract (JPMorgan)

150.  Fannie Mae incorporates by reference the preceding paragraphs of this Complaint.

151.  At all relevant times, Fannie Mae was a party to an ISDA Master Agreement with JPMorgan, under which Fannie Mae entered into a substantial volume of Libor-pegged interest-rate swap transactions with JPMorgan.[130]  The ISDA Master Agreement is accompanied by and includes a Schedule, a Credit Support Annex, and Confirmations.  The Confirmations are the documents and other evidence exchanged between the parties confirming specific transactions.

152.  By manipulating Libor to achieve artificially low rates, and by demanding performance based on a manipulated and suppressed Libor, JPMorgan breached the ISDA Master Agreement and the underlying Libor-indexed interest-rate swap transactions that form part of the ISDA Master Agreement.  Specifically, JPMorgan promised to calculate, value, and settle their transactions at a legitimate, honest Libor rate—that is, a rate determined in accordance with its good-faith compliance with the legitimate bidding process established by the BBA.  In breach of this agreement, JPMorgan calculated interest payments and valued and settled trades at rate that it knew, through its own false submissions and its status as a Libor panel bank, was not determined through a legitimate process and instead was false.

153.  JPMorgan's actions violated numerous provisions of the agreement, including Section 4(c) of the ISDA (requiring JPMorgan to "comply in all material respects with all applicable laws and orders to which it may be subject . . .") and Paragraph 11(d) of the Credit

---

[129]  *See* ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

[130]  *See* Ex. 24 (relevant portions of JPMorgan ISDA).

Support Annex (requiring JPMorgan to perform all obligations under the Annex, including all calculations, valuations, and determinations, in "good faith and in a commercially reasonable manner").

154.     JPMorgan also breached certain material representations that it made to Fannie Mae in the ISDA.  Upon entering the ISDA Master Agreement and again upon entering into each underlying swap transaction, JPMorgan represented that "No Event of Default or Potential Event of Default . . . has occurred and is continuing[.]"[131]  From at least 2007 through 2010, this representation was not true because JPMorgan was, among other things, valuing and settling transactions at an interest rate that it knew was not legitimate.[132]

155.     As a result of JPMorgan's material, continuing breach of the ISDA Master Agreement, Fannie Mae has incurred substantial damages.  Fannie Mae has also incurred, and is entitled to recover, reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the agreement.[133]

**Count IX:   Breach of Implied Duty of Good Faith and Fair Dealing (Against Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, BofA, Citibank, and JPMorgan)**

156.     Fannie Mae incorporates by reference the preceding paragraphs in this Complaint.

157.     Fannie Mae's ISDA contracts were governed by New York law, which implies a duty of good faith and fair dealing in every contract.  This duty embraces a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other

---

[131]  ISDA § 3(b).

[132]   An Event of Default occurs based on a party's "[f]ailure . . . to comply with or perform any agreement or obligation . . . to be complied with or performed by the party in accordance with this Agreement[.]"  *Id.* § 5(a)(ii). Misrepresentations provide another Event of Default trigger.  *See id.* § 5(a)(iv) (an Event of Default occurs if a "representation . . . made or repeated . . . in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated").

[133]   *See* ISDA § 11 (requiring a defaulting party to pay the other party's out-of-pocket expenses, including legal fees).

party to receive the fruits of the contract.  The duty includes any promises that a reasonable person in the position of the promisee would be justified in understanding were included.

158.    Inherent in Defendants' promise to pay Libor-based interest under the ISDA was a promise that those same banks would not manipulate and suppress Libor to gain financial advantage over Fannie Mae.  Defendants' wrongful conduct injured Fannie Mae's right to receive transactions that were valued and settled based on a legitimate Libor.  Fannie Mae bargained for an accurate calculation and payment of Libor.  Due to Defendants' wrongful conduct, Fannie Mae got neither.

159.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Fannie Mae has suffered substantial damages and incurred reasonable out-of-pocket expenses, including legal fees.  Fannie Mae seeks all damages caused by Defendants' breach, at an amount to be determined at trial.

## Count X:  Common Law Fraud (Against All Defendants)

160.    Fannie Mae incorporates by reference the preceding paragraphs in this Complaint.

161.    This count is brought against all Defendants for joint and several liability for all of Fannie Mae's damages resulting from Defendants' manipulation and suppression of Libor.

162.    Defendants made repeated false representations and material omissions of fact during the relevant period.  Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, BofA, Citibank, JPMorgan, and Rabobank were Libor panel banks.  They each made false Libor submissions to the BBA with the understanding that those submissions would be published individually and would be used to calculate Libor, a benchmark incorporated into trillions of dollars of financial instruments.  In connection with their Libor submissions, each Libor Panel Defendant falsely represented:

a.  Its Libor submissions were consistent with the published definition of Libor.

b.  It based its Libor submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other panel banks.

c.  Its Libor submissions represented the actual rates at which it honestly believed another bank would offer it funds in the London interbank market.

163.  The BBA participated in the fraudulent conduct by publishing Libor despite knowing, or recklessly disregarding, that the rate was based upon false submissions.  The BBA falsely represented:

a.  Libor rates communicated by, and through, the BBA were based on honest submissions that were consistent with the published definition of Libor.

b.  The BBA conducted a full investigation in 2008 into Libor submissions and confirmed that the Libor submissions were honest and consistent with the published definition of Libor.

c.  The BBA actively monitored the panel banks' submissions to ensure that they were consistent with the published definition of Libor.

The BBA failed to disclose that Libor was unreliable or false and actively concealed this fact from the public, thereby knowingly or recklessly condoning the Libor Panel Defendants' conduct.

164.  Moreover, every time Barclays, UBS, RBS, Deutsche Bank, Credit Suisse, BofA, Citibank, and JPMorgan calculated interest rates, issued collateral calls, and settled swaps and other Libor-pegged transactions with Fannie Mae, they falsely represented that Libor was legitimate and/or failed to disclose that Libor was being manipulated.  Further, beginning in mid-2008, these Defendants and the BBA falsely represented that deviations between Libor and certain benchmarks were caused by the economic crisis rather than their own false submissions.

165.    Defendants made the representations described herein knowing that they were false and misleading, or with reckless disregard for their truth, to perpetrate their fraudulent and collusive conduct.  As described in detail herein, Barclays, UBS, RBS, and Rabobank have admitted that they made false Libor submissions in order to increase their trading profits and/or to mask their true financial condition.  First, Barclays admitted that its "swap traders and rate submitters who engaged in efforts to manipulate LIBOR and EURIBOR submissions were well aware of the basic features of the derivatives products tied to these benchmark interest rates; *accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer adverse financial consequences with respect to those particular transactions*."[134]  Second, the FSA concluded that "RBS also inappropriately considered the impact of LIBOR and RBS's LIBOR submissions on the profitability of transactions in its money market trading books as a factor when making (or directing others to make) . . . USD LIBOR submissions."[135]  Third, the CFTC concluded that UBS "used false benchmark interest rate submissions, including U.S. Dollar LIBOR, to protect itself against media speculation concerning its financial stability during the financial crisis."[136]  Fourth, Rabobank admitted that "[f]rom as early as 2005 through at least November 2010, certain Rabobank swaps traders requested that certain Rabobank LIBOR and Euribor submitters submit LIBOR and Euribor contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of LIBOR and Euribor."[137]

---

[134]   Barclays DOJ SOF, *supra* note 1 ¶¶ 32-33 (emphasis added).

[135]   RBS FSA Final Notice, *supra* note 3 ¶ 5.

[136]   UBS CFTC Order, *supra* note 2, at 2.

[137]   Rabobank DOJ SOF, *supra* note 4 ¶ 15.

166.    On information and belief, and as detailed throughout this Complaint, Deutsche Bank, Credit Suisse, BofA, Citibank, and JPMorgan also made the representations described herein knowing that they were false and misleading, or with reckless disregard for their truth, to perpetrate their fraudulent and collusive conduct.  First, regulators and law enforcement agencies around the world are investigating these banks' submissions.  Second, in relation to the EDDR and CDS spreads, these banks' Libor submissions were similar to—and often more questionable than—those of Barclays, UBS, and RBS.  Third, *The Wall Street Journal* reported, based on a review of internal documents provided to regulators, that Deutsche Bank entered trades with "extremely large" interest rate risk because it knew it could influence those rates.[138]  Fourth, the United Kingdom's Serious Fraud Office recently charged a former UBS and Citigroup trader with eight counts of "conspiring to defraud" in an attempt to manipulate Libor.  The charges allege that the trader conspired with employees of eight banks, including JPMorgan and Deutsche Bank, to "dishonestly seek[] to manipulate [Libor] . . . with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another."[139]

167.    Defendants made the false and misleading statements described herein with the intent to induce the reliance of Fannie Mae.  First, Defendants knew, or were severely reckless in not knowing, that Fannie Mae would rely on the accuracy of Libor in deciding whether, and on what terms, to enter and/or settle swaps and other Libor-indexed transactions.  Second, Defendants had reason to expect that Fannie Mae was among the class of persons who would receive and rely on their misrepresentations about Libor, including statements made directly to Fannie Mae and statements passed through the BBA or other channels to the public.

---

[138] Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, *supra* note 52.

[139] Enrich, *Libor Case Ensnares More Banks, supra* note 5.

168.    Defendants had a duty to disclose the manipulation of Libor to Fannie Mae and to the public, but they failed to do so.  Such duty was triggered not only by the contractual relationship between certain Defendants and Fannie Mae, but also by Defendants' exclusive knowledge regarding their wrongful conduct.  By their misrepresentations, omissions, and affirmative denials, each Defendant participated in concealing the falsity of its submissions and the manipulation and suppression of Libor from Fannie Mae.  Furthermore, each Defendant materially aided the fraud of the others by affirmatively submitting false Libor information, and by concealing false Libor information submitted by others, so that Libor appeared to be legitimately set when it was not.

169.    Fannie Mae reasonably and justifiably relied on Defendants' false representations and misleading omissions by entering into and performing under huge volumes of Libor-indexed transactions.  At the time these misrepresentations were made, Fannie Mae was ignorant of the true facts.  Fannie Mae would not have entered into these transactions on the terms that it did, or performed as it did (by, for example, making and receiving payments based on an artificial rate of interest), had it known of Defendants' wrongful conduct.

170.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Fannie Mae entered into financial instruments linked to Libor in reliance on Libor's integrity and made inflated payments (or received depressed payments) in reliance on Libor's integrity.  While the final figure will be proven at trial, Fannie Mae currently estimates that it has incurred damages of approximately $800 million as a result of Defendants' fraudulent manipulation and suppression of Libor.  In addition, because Defendants' fraud was willful and wanton, Fannie Mae is entitled to recover punitive damages.

**Count XI:  Aiding and Abetting Common Law Fraud (Against All Defendants)**

171.    Fannie Mae incorporates by reference the preceding paragraphs in this Complaint.

172.    Each Defendant aided and abetted the fraud of the other Defendants.

173.    By falsifying its own Libor submissions, each Libor Panel Defendant gave substantial assistance to the other Defendants in their efforts to suppress and manipulate Libor.

174.    By misrepresenting the integrity of Libor and omitting to disclose that it was being suppressed and manipulated, each Defendant gave substantial assistance to the others in their efforts to suppress and manipulate Libor.

175.    Each of the Defendants knew, among other ways from their substantial involvement in the Libor-setting process, of the fraud perpetrated by the others.  Each knew of the representations and omissions made by the others.  Each also knew that the representations and omissions made by each of the other Defendants were false and/or misleading at the time they were made.

176.    Each Defendant gave substantial assistance to and/or facilitated and encouraged each of the other panel banks in their fraud by colluding to artificially suppress Libor.  Each Libor Panel Defendant's submission was a necessary input for calculation of the published Libor.

177.    Fannie Mae reasonably and justifiably relied on Defendants' false representations and misleading omissions when entering and performing under transactions indexed to Libor.

178.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Fannie Mae entered into financial instruments linked to Libor in reliance on Libor's integrity and made inflated payments (or received depressed payments) in reliance on Libor's integrity.  While the final figure will be proven at trial, Fannie Mae currently estimates that it has suffered damages of approximately $800 million as a result of Defendants' fraudulent

67

manipulation and suppression of Libor.  In addition, because Defendants' fraud was willful and wanton, Fannie Mae is entitled to recover punitive damages.

**Count XII:  Civil Conspiracy to Commit Fraud (Against All Defendants)**

179.    Fannie Mae incorporates by reference the preceding paragraphs in this Complaint.

180.    Defendants entered into a corrupt agreement to manipulate and suppress Libor between at least 2007 and 2010.  Because of their substantial involvement in the Libor-setting process, each Defendant had the means and opportunity to join and further this conspiracy because rates submitted by the panel banks each day were made public on the same day with the identity of each submitter disclosed.  As a result, each bank knew the others' submissions in time to influence its own submissions for the following day.  This structure facilitated collusion because Defendants could follow the submissions of other banks and also determine whether other banks followed their corrupt agreement.

181.    Defendants committed numerous overt acts in furtherance of their corrupt agreement.  As CFTC Chairman Gary Gensler recently stated: "[A]s law enforcement actions . . . have shown, LIBOR and other benchmarks have been readily and pervasively rigged. . . . Barclays, UBS and RBS paid fines of approximately $2.5 billion for manipulative conduct relating to these rates. . . . ***And in each case, there was evidence of collusion with other banks***."[140]  Evidence proving this conspiracy includes the following:

- RBS knew and admitted that banks were setting Libor "to where it suits their books," and RBS senior managers knew that Libor panel banks were "systematically rigging" Libor and that some RBS traders "colluded with counterparts at other banks to boost profits from interest-rate futures by aligning their submissions."[141]

---

[140] *Remarks of CFTC Chairman Gary Gensler* (emphasis added), *supra* note 6.

[141] Vaughan & Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, *supra* note 27.

- UBS and Barclays both monitored the other banks' submissions and directed that their own submissions be "on the low side"[142] or stay "within the pack."[143] Similarly, a Barclays employee told an employee of the New York Fed that Barclays just "fit[s] in with the rest of the crowd . . . [and was] not posting um, an honest LIBOR."[144]

- A Barclays Libor submitter sent an email stating that Libor contributors, including Barclays, were making "false and dishonest" submissions.[145] A Barclays employee also said he was aware of other banks that were making Libor submissions that were below what they actually paid in comparable transactions.[146]

- Bank of America, Citibank, Credit Suisse, Deutsche Bank, and JPMorgan are all being investigated for alleged manipulation of their Libor submissions. Moreover, these banks' submissions share the same questionable characteristics as those of the admitted wrongdoers, including disconnect from the ERRD and/or CDS spreads.

- The United Kingdom's Serious Fraud Office has charged former UBS and Citigroup trader Tom Hayes with eight counts of "conspiring to defraud" in an attempt to manipulate Libor by conspiring with employees of eight banks, including JPMorgan, Deutsche Bank, and RBS.

- The DOJ and CFTC found that a Rabobank Yen Libor submitter and a Rabobank Euribor submitter had agreements with traders at other banks to manipulate those rates. Rabobank had the same opportunity and incentive to conspire to manipulate USD Libor and, on information and belief, it did so conspire.

182. Defendants intentionally took these and other overt acts described above to further the corrupt agreement between them and to carry out a common plan to execute a fraud on Fannie Mae and to benefit Defendants.

183. Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth herein.

---

[142] UBS DOJ SOF, *supra* note 8 ¶¶ 102-105.

[143] Barclays DOJ SOF, *supra* note 1 ¶ 36.

[144] *See* N.Y. Fed. Reserve Bank, Unofficial Transcript, ID09274211 at 6, *supra* note 34.

[145] Barclays DOJ SOF, *supra* note 1 ¶ 45.

[146] *See* N.Y. Fed. Reserve Bank, Unofficial Transcript, BARC-MAY6-000098-100, at 98-100, *supra* note 38.

184.     As a direct and proximate result of the wrongful conduct of each of the Defendants, Fannie Mae entered into financial instruments linked to Libor in reliance on Libor's integrity and made inflated payments (or received depressed payments) in reliance on Libor's integrity.  While the final figure will be proven at trial, Fannie Mae currently estimates that it has incurred damages of approximately $800 million as a result of Defendants' fraudulent manipulation and suppression of Libor.  In addition, because Defendants' fraud was willful and wanton, Fannie Mae is entitled to recover punitive damages.[147]

### VII.     PERFORMANCE BY PLAINTIFF

185.     Fannie Mae has performed, or been excused from performing, all of the terms and conditions of the respective agreements on its part to be performed.

### VIII.     PRAYER FOR RELIEF

WHEREFORE, Fannie Mae prays for relief as follows:

An award in favor of Fannie Mae against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.   Fannie Mae's monetary losses on its Libor-indexed transactions with the Libor Panel Defendants and other counterparties, in an amount to be determined at trial but that is currently estimated to be $800 million;

b.   Consequential damages;

c.   Punitive damages;

d.   Attorneys' fees and costs;

e.   Prejudgment interest at the maximum legal rate; and

---

[147]   Because the MDL Court has already dismissed the Lead Plaintiffs' claims for violations of Section 1 of the Sherman Act for lack of antitrust standing and denied reconsideration, Fannie Mae does not raise any antitrust claims in this Complaint.  However, if for any reason the Sherman Act claims are later reinstated, Fannie Mae reserves the right to amend its Complaint to include antitrust claims.

f.   Such other and further relief as the Court may deem just and proper.

Dated:      New York, New York
            October 31, 2013

WARNER PARTNERS, P.C.

By:   _____

Kenneth E. Warner (KW-5524)
950 Third Avenue, 32nd Floor
New York, NY  10022
Tel:  (212) 593-8000
Email:  kwarner@warnerpc.com

GIBBS & BRUNS LLP

Kathy D. Patrick (*pro hac* admission to be requested)
kpatrick@gibbsbruns.com
Sam W. Cruse III (*pro hac* admission to be requested)
scruse@gibbsbrns.com
Kate Kaufmann Shih (KS-2005)
kshih@gibbsbruns.com
David Sheeren (*pro hac* admission to be requested)
dsheeren@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, TX  77002
Tel:  (713) 650-8805