13-3565
In re: LIBOR-Based Financial Instruments Antitrust Litigation

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

1:11-md-02262-NRB

### August Term, 2015

(Argued: November 13, 2015     Decided: May 23, 2016)

Docket Nos. 13-3565-cv (L), 13-3636-cv (CON), 15-432-cv (CON), 15-441-cv (CON), 15-454-cv (CON), 15-477-cv (CON), 15-494-cv (CON), 15-498-cv (CON), 15-524-cv (CON), 15-537-cv (CON), 15-547-cv (CON), 15-551-cv (CON), 15-611-cv (CON), 15-620-cv (CON), 15-627-cv (CON), 15-733-cv (CON), 15-744-cv (CON), 15-778-cv (CON), 15-825-cv (CON), 15-830-cv (CON)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ELLEN GELBOIM et al.,

Plaintiffs-Appellants,

- v.-

BANK OF AMERICA CORPORATION et al.,

Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __May 23, 2016__

Before:            JACOBS, RAGGI, and LYNCH, Circuit Judges.

Plaintiffs-appellants, comprising individuals and entities that held diverse

CERTIFIED COPY ISSUED ON 05/23/2016

financial instruments, allege that the defendant banks colluded to depress a

benchmark incorporated into those instruments, thereby decreasing the

instruments' financial returns in violation of Section One of the Sherman Act.

The United States District Court for the Southern District of New York

(Buchwald, J.) dismissed the lawsuit for failure to allege antitrust injury.  We

vacate the judgment and remand for further proceedings consistent with this

opinion.

> THOMAS C. GOLDSTEIN (with Eric
> F. Citron on the brief),
> Goldstein & Russell, P.C.,
> 7475 Wisconsin Avenue, Suite
> 850, Bethesda, MD, 20814, for
> Plaintiffs-Appellants Ellen Gelboim and
> Linda Zacher in Case No. 13-3565.
>
> ROBERT F. WISE, JR. (with
> Arthur J. Burke & Paul S.
> Mishkin on the brief), Davis Polk &
> Wardwell LLP, 450 Lexington Avenue,
> New York, NY, 10017, for Defendants-
> Appellees Bank of America Corporation,
> Bank of America, N.A., and Merrill Lynch,
> Pierce, Fenner & Smith, Inc. (f/k/a Banc of
> America Securities LLC)
> (additional counsel for the many parties
> and amici are listed in Appendix A)

2

DENNIS JACOBS, <u>Circuit Judge</u>:

Appellants purchased financial instruments, mainly issued by the defendant banks, that carried a rate of return indexed to the London Interbank Offered Rate ("LIBOR"), which approximates the average rate at which a group of designated banks can borrow money.  Appellees, 16 of the world's largest banks ("the Banks"), were on the panel of banks that determined LIBOR each business day based, in part, on the Banks' individual submissions.  It is alleged that the Banks colluded to depress LIBOR by violating the rate-setting rules, and that the payout associated with the various financial instruments was thus below what it would have been if the rate had been unmolested.  Numerous antitrust lawsuits against the Banks were consolidated into a multi-district litigation ("MDL").

The United States District Court for the Southern District of New York (Buchwald, <u>J.</u>) dismissed the litigation in its entirety on the ground that the complaints failed to plead antitrust injury, which is one component of antitrust standing.  The district court reasoned that the LIBOR-setting process was collaborative rather than competitive, that any manipulation to depress LIBOR therefore did not cause appellants to suffer anticompetitive harm, and that they

3

have at most a fraud claim based on misrepresentation.  The complaints were

thus dismissed on the ground that they failed to allege harm to competition.

   We vacate the judgment on the ground that: (1) horizontal price-fixing

constitutes a *per se* antitrust violation; (2) a plaintiff alleging a *per se* antitrust

violation need not separately plead harm to competition; and (3) a consumer who

pays a higher price on account of horizontal price-fixing suffers antitrust injury.

Since the district court did not reach the second component of antitrust standing

--a finding that appellants are efficient enforcers of the antitrust laws--we remand

for further proceedings on the question of antitrust standing.  The Banks urge

affirmance on the alternative ground that no conspiracy has been adequately

alleged; we reject this alternative.


## BACKGROUND

   "Despite the legal complexity of this case, the factual allegations are rather

straightforward."  In re: LIBOR-Based Fin. Instruments Antitrust Litig., 935 F.

Supp. 2d 666, 677 (S.D.N.Y. 2013) ("LIBOR I").  Appellants entered into a variety

of financial transactions at interest rates that reference LIBOR.  Because LIBOR is

a component or benchmark used in countless business dealings, it has been called

4

"the world's most important number."[1]  Issuers of financial instruments typically set interest rates at a spread above LIBOR, and the interest rate is frequently expressed in terms of the spread.  LIBOR rates are reported for various intervals, such as one month, three months, six months, and twelve months.

The LIBOR-based financial instruments held by the appellants included: (1) asset swaps, in which the owner of a bond pegged to a fixed rate pays that fixed rate to a bank or investor while receiving in return a floating rate based on LIBOR; (2) collateralized debt obligations, which are structured asset-backed securities with multiple tranches, the most senior of which pay out at a spread above LIBOR; and (3) forward rate agreements, in which one party receives a fixed interest rate on a principal amount while the counterparty receives interest at the fluctuating LIBOR on the same principal amount at a designated endpoint.  These examples are by no means exhaustive.

The Banks belong to the British Bankers' Association ("BBA"), the leading trade association for the financial-services sector in the United Kingdom.  During the relevant period, the BBA was a private association that was operated without

---

[1]  See Mark Broad, The world's most important number? BBC NEWS (October 20, 2008 10:29 p.m.), http://news.bbc.co.uk/2/hi/business/7680552.stm.

regulatory or government oversight and was governed by senior executives from twelve banks.[2]  The BBA began setting LIBOR on January 1, 1986, using separate panels for different currencies.  Relevant to this appeal, the U.S. Dollar ("USD") LIBOR panel was composed of 16 member banks of the BBA.

The daily USD LIBOR was set as follows.  All 16 banks were initially asked: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m.?"  Each bank was to respond on the basis of (in part) its own research, and its own credit and liquidity risk profile.  Thomson Reuters later compiled each bank's submission and published the submissions on behalf of the BBA.  The final LIBOR was the mean of the eight submissions left after excluding the four highest submissions and the four lowest.  Among the many uses and advantages of the LIBOR-setting process is the ability of parties to enter into floating-rate transactions without extensive negotiation of terms.

Three key rules governed the LIBOR-setting process: each panel bank was to independently exercise good faith judgment and submit an interest rate based

---

[2] These banks included Barclays Bank PLC ("Barclays"), Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland plc ("RBS").

upon its own expert knowledge of market conditions; the daily submission of each bank was to remain confidential until after LIBOR was finally computed and published; and all 16 individual submissions were to be published along with the final daily rate and would thus be "transparent on an *ex post* basis."[3] Thus any single bank would be deterred from submitting an outlying LIBOR bid that would risk negative media attention and potential regulatory or government scrutiny. Collectively, these three rules were intended as "safeguards ensuring that LIBOR would reflect the forces of competition in the London interbank loan market."[4]

Although LIBOR was set jointly, the Banks remained horizontal competitors in the sale of financial instruments, many of which were premised to some degree on LIBOR. With commercial paper, for example, the Banks received cash from purchasers in exchange for a promissory obligation to pay an amount

---

[3] "Second Consolidated Amended Complaint," Mayor & City Council of Baltimore & City of New Britain Firefighters' & Police Benefit Fund, Texas Competitive Electric Holdings Company LLC v. Credit Suisse Group AG et al., In re: LIBOR-Based Fin. Instruments Antitrust Litig., No. 1:11-md-2262 (S.D.N.Y. Sept. 10, 2013) at 24 ¶ 62 (Doc. 406) (hereinafter "OTC Second Amended Complaint").

[4] Id. ¶ 65.

based, in part, on LIBOR at a specified maturity date (usually nine months); in such transactions, the Banks were borrowers and the purchasers were lenders. Similarly, with swap transactions, the Banks received fixed income streams from purchasers in exchange for variable streams that incorporated LIBOR as the reference point.

A LIBOR increase of one percent would have allegedly cost the Banks hundreds of millions of dollars. Moreover, since during the relevant period the Banks were still reeling from the 2007 financial crisis, a high LIBOR submission could signal deteriorating finances to the public and the regulators.

Appellants allege that the Banks corrupted the LIBOR-setting process and exerted downward pressure on LIBOR to increase profits in individual financial transactions and to project financial health. In a nutshell, appellants contend that, beginning in 2007, the Banks engaged in a horizontal price-fixing conspiracy, with each submission reporting an artificially low cost of borrowing in order to drive LIBOR down. The complaints rely on two sources.

The vast majority of allegations follow directly from evidence collected in

governmental investigations.[5]  The United States Department of Justice ("DOJ")

unearthed numerous potentially relevant emails, communications, and

documents, some of which are referenced in the complaints and only a few of

which are referenced for illustrative purposes.  Prompted by the DOJ

investigations, three banks--Barclays, UBS, and RBS--have reached settlements

over criminal allegations that they manipulated and fixed LIBOR.

In addition, the complaints rely on statistics.  The DOJ compiled evidence

that from June 18, 2008 until April 14, 2009, UBS's individual three-month LIBOR

submissions were identical to the later-published LIBOR benchmark that was

based on all 16 submissions; the statistical probability that UBS independently

predicted LIBOR exactly over approximately ten consecutive months is

---

[5]  See, e.g., "Second Amended Complaint," The City of Philadelphia & The
Pennsylvania Intergovernmental Cooperation Authority v. Bank of America
Corporation et al., In re: LIBOR-Based Fin. Instruments Litig., No. 1:11-md-2262
(S.D.N.Y. Oct. 6, 2014) at 33 ¶ 104 (Doc. 667) ("[A] Barclays manager conceded in
a recently-disclosed liquidity call to the FSA *to the extent that, um, the LIBORs
have been understated, are we guilty of being part of the pack?  You could say we
are*." (bolding and emphasis in original) (internal quotation marks omitted)); id.
at 41 ¶ 122 ("UBS managers directed that the bank's USD Libor submissions be
artificially suppressed so as to *place UBS in the middle of the pack of panel bank
submissions* . . . ." (bolding and emphasis in original) (internal quotation marks
omitted)); id. at 47 ¶ 140 ("One RBS trader gloated, [i]t's just amazing how Libor
fixing can make you that much money . . . . *It's a cartel now in London*." (bolding
and emphasis in original) (internal quotation marks omitted)).

9

minuscule. Furthermore, prior to 2007, the value of LIBOR had moved in tandem with the Federal Reserve Eurodollar Deposit Rate ("FRED"), with LIBOR tracking slightly above FRED. Beginning in 2007, however, the two rates switched positions, and LIBOR did not consistently again rise above FRED until around October 2011, when the European Commission began an inquiry into allegations of LIBOR-fixing. The complaints adduce other analyses and phenomena to support the hypothesis that the Banks conspired to depress LIBOR.

### **Procedural History**

This sprawling MDL involves a host of parties, claims, and theories of liability; the present appeal has taken a circuitous route to this Court, having already once been to the Supreme Court.

Four groups of plaintiffs filed complaints that became subject to the Banks' motions to dismiss; three of the complaints were purported class actions. The members of one putative class are the purchasers of "'hundreds of millions of dollars in interest rate swaps directly from at least one [d]efendant in which the rate of return was tied to LIBOR.'" LIBOR I, 935 F. Supp. 2d at 681 (quoting OTC Second Amended Complaint at 7 ¶ 12). The district court helpfully labeled this

group as over-the-counter ("OTC") plaintiffs; the lead OTC plaintiffs are the

Mayor and City Council of Baltimore and the City of New Britain Firefighters

and Police Benefit Fund. The members of the second putative class are

bondholders who allege that the conspiracy reduced the returns on debt

securities in which they held an interest. The lead bondholder plaintiffs are:

Ellen Gelboim, the sole beneficiary of an individual retirement account that

owned a LIBOR-based debt security issued by General Electric Capital

Corporation; and Linda Zacher, a similarly situated beneficiary with rights to a

LIBOR-based debt security issued by Israel.

 Third, the Schwab plaintiffs, who filed three separate amended

complaints,[6] each assert injuries substantially similar to those claimed by the

---

[6] The first of these was filed by Schwab Bank, which consists of the following entities: (i) the Charles Schwab Corporation; (ii) Charles Schwab Bank, N.A., a wholly-owned subsidiary of the Charles Schwab Corporation; and (iii) Charles Schwab & Co, Inc., another wholly-owned subsidiary of the Charles Schwab Corporation. The second amended complaint is attributable to the Schwab Bond plaintiffs, who are comprised of: (i) Schwab Short-Term Bond Market Fund, (ii) Schwab Total Bond Market Fund, and (iii) Schwab U.S. Dollar Liquid Assets Fund. Finally, the Schwab Money amended complaint has seven plaintiffs: (i) Schwab Money Market Fund, (ii) Schwab Value Advantage Money Fund, (iii) Schwab Retirement Advantage Money Fund, (iv) Schwab Investor Money Fund, (v) Schwab Cash Reserves, (vi) Schwab Advisor Cash Reserves, and (vii) Schwab YieldPlus Fund. Contingent interests of Schwab YieldPlus Fund have passed to plaintiff Schwab YieldPlus Fund Liquidation Trust. See In re: LIBOR-Based Fin.

OTC and bondholder plaintiffs. Finally, the members of the third putative class (the Exchange-based plaintiffs) claim injury from the purchase and trading of contracts based on U.S. dollars deposited in commercial banks abroad (Eurodollar futures contracts). The buyer of a typical Eurodollar futures contract pays the seller a fixed price at the outset and the seller in exchange pays the buyer a "settlement price" at the end date, calculated on the basis of the three-month LIBOR. Options on Eurodollar futures contracts can be traded, and their value depends on the settlement price. The seven lead plaintiffs[7] allege that the Banks' "suppression of LIBOR caused Eurodollar contracts to trade and settle at artificially high prices," reducing gains made in trades. LIBOR I, 935 F. Supp. 2d at 683.

---

Instruments Antitrust Litig., No. 1:11md2262 (S.D.N.Y. Apr. 30, 2012) (Docs. 146-148).

[7] These seven plaintiffs are: (1) Metzler Investment GmbH, a German company that launched and manages investment funds trading in Eurodollar futures; (2) FTC Futures Fund SICAV and (3) FTC Futures Fund PCC Ltd., funds based in Luxembourg and Gibraltar, respectively, that each trade Eurodollar futures; (4) Atlantic Trading USA, LLC and (5) 303030 Trading, LLC, Illinois limited liability companies that likewise trade Eurodollar futures; and (6) Gary Francis and (7) Nathanial Haynes, Illinois residents engaged in the same course of business. See LIBOR I, 935 F. Supp. 2d at 683.

The Exchange-based plaintiffs commenced proceedings on April 15, 2011; the OTC plaintiffs followed a couple of months later; and numerous individual cases accumulated. The Judicial Panel on Multidistrict Litigation transferred and consolidated the cases in the Southern District of New York. See In re: LIBOR-Based Fin. Instruments Antitrust Litig., 802 F. Supp. 2d 1380, 1381 (J.P.M.L. 2011). The Schwab and bondholder plaintiffs subsequently enlisted. In addition to the federal antitrust claims, the complaints assert numerous federal and state law causes of action irrelevant to this appeal.[8] After each group of plaintiffs amended their respective complaints, the Banks moved to dismiss. Several new complaints were added. As a management measure, the district court stayed the filing of new complaints until resolution of the pending motions to dismiss. See LIBOR I, 935 F. Supp. 2d at 677.

The motions to dismiss were granted based on the finding that none of the appellants "plausibly alleged that they suffered antitrust injury, thus, on that basis alone, they lack standing." Id. at 686. This ruling rested on three premises:

---

[8] The exception is the bondholder plaintiffs' complaint, which asserts solely federal antitrust claims.

13

[1] "Plaintiffs' injury would have resulted from [d]efendants' misrepresentation, not from harm to competition," because the LIBOR-setting process was cooperative, not competitive. Id. at 688.

[2] Although the complaints "might support an allegation of price fixing," antitrust injury is lacking because the complaints did not allege restraints on competition in pertinent markets and therefore failed to "indicate that plaintiffs' injury resulted from an anticompetitive aspect of defendants' conduct." Id.

[3] Supreme Court precedent forecloses a finding of antitrust injury if "the harm alleged . . . could have resulted from normal competitive conduct" as here, because LIBOR could have been depressed if "each defendant decided independently to misrepresent its borrowing costs to the BBA." Id. at 690.

The district court rejected the notion that LIBOR operated as a proxy for competition and distinguished cases cited by appellants on the ground that they involved "harm to competition which is not present here." Id. at 693.

The ensuing motions to amend, made by the OTC, bondholder, and Exchange-based plaintiffs, were denied on the ground that, given "the number of original complaints that had been filed" and "the obvious motivation to craft sustainable first amended complaints containing all factual and legal allegations that supported plaintiffs' claims, the [district court] was entitled to rely on those pleadings to contain the strongest possible statement of plaintiffs' case based on the collective skills of plaintiffs' counsel." In re: LIBOR-Based Fin. Instruments

14

Antitrust Litig., 962 F. Supp. 2d 606, 626 (S.D.N.Y. 2013) ("LIBOR II"). The denial of the motions to amend was also premised on the alternative ground of futility because the proposed amendments lacked allegations "that the process of competition was harmed because defendants failed to compete with each other or otherwise interacted in a manner outside the bounds of legitimate competition." Id. at 627-28.

Appeals filed by the bondholder plaintiffs and the Schwab plaintiffs in 2013 were dismissed *sua sponte* for lack of subject matter jurisdiction "because a final order ha[d] not been issued by the district court as contemplated by 28 U.S.C. § 1291, and the orders appealed from did not dispose of all claims in the consolidated action." In re: LIBOR-Based Fin. Instruments Antitrust Litig., Nos. 13-3565(L) & 13-3636(Con), 2013 WL 9557843, at *1 (2d Cir. Oct. 30, 2013). On a writ of certiorari, the Supreme Court unanimously reversed, holding that "[p]etitioners' right to appeal ripened when the [d]istrict [c]ourt dismissed their case, not upon eventual completion of multidistrict proceedings in all of the consolidated cases." Gelboim v. Bank of Am. Corp., 135 S. Ct. 897, 902 (2015).

To alleviate any ensuing risks of piecemeal litigation, the Supreme Court highlighted Federal Rule of Civil Procedure 54(b), which provides for the entry of

15

partial judgment on a single or subset of claims: "[d]istrict courts may grant

certifications under that Rule, thereby enabling plaintiffs in actions that have not

been dismissed in their entirety to pursue immediate appellate review." Id. at

906. Numerous plaintiffs in the MDL action availed themselves of this

mechanism, and these appeals were consolidated on April 15, 2015. See In re:

LIBOR-Based Fin. Instruments Antitrust Litig., No. 13-3565 (2d Cir. Apr. 15, 2015)

(Doc. 231). After extensive briefing on both sides, including the submission of

numerous amicus briefs, this appeal is now ripe for disposition.


## DISCUSSION

"We review the grant of a motion to dismiss *de novo*, accepting as true all

factual claims in the complaint and drawing all reasonable inferences in the

plaintiff's favor." Fink v. Time Warner Cable, 714 F.3d 739, 740-41 (2d Cir. 2013).

The denial of leave to amend is similarly reviewed de novo because the denial

was "based on an interpretation of law, such as futility." Panther Partners Inc. v.

Ikanos Commc'ns., Inc., 681 F.3d 114, 119 (2d Cir. 2012).

An antitrust plaintiff must show both constitutional standing and antitrust

standing. See Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of

16

Carpenters, 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."); Port Dock & Stone Corp. v. Oldcastle, Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("Antitrust standing is distinct from constitutional standing, in which a mere showing of harm will establish the necessary injury."). Like constitutional standing, antitrust standing is a threshold inquiry resolved at the pleading stage. See Gatt Commc'ns. v. PMC Assocs., L.L.C., 711 F.3d 68, 75 (2d Cir. 2013). In this case, the harm component of constitutional standing is uncontested, and easily satisfied by appellants' pleading that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR. See Sanner v. Bd. of Trade of City of Chi., 62 F.3d 918, 924 (7th Cir. 1995) (holding that farmers who sold crop at allegedly depressed prices suffered harm sufficient for Article III standing).

Less clear is appellants' demonstration of an antitrust violation and antitrust standing. The interplay between these two concepts has engendered

17

substantial confusion.[9]  To avoid a quagmire, this Court (among others) assumes "the existence of a violation in addressing the issue of [antitrust] standing." Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 437 (2d Cir. 2005) ("Thus, while the issue of an antitrust violation in this case is by no means clear, for purposes of this appeal we assume the alleged violation and assess only plaintiffs' standing to pursue their claim.").  This expedient can cause its own problems.[10]  The district court proceeded directly to the question of antitrust injury--omitting any mention of antitrust violation--but then elided the distinction between antitrust violation and antitrust injury by placing considerable weight on appellants' failure to show "harm to competition." LIBOR I, 935 F. Supp. 2d at 688.  Although we would not ordinarily consider whether the complaints state an antitrust violation when assessing antitrust

---

[9] See SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 43 (1st Cir. 1995) ("[C]ourts sometimes have difficulty, well justified in certain cases, in separating standing or antitrust injury issues from two other problems: whether there has been an antitrust violation at all, and whether the plaintiff has suffered any injury causally (in the 'but for' sense) related to the challenged conduct.").

[10] See Gatt, 711 F.3d at 76 n.9 ("The conditional phrasing of this step of the analysis hints at its difficulty.  When assessing antitrust injury, we assume that the practice at issue is a violation of the antitrust laws, and are, thus, in the difficult position of positing a rationale for the antitrust laws' prohibition of conduct that may, in fact, not be prohibited." (citation omitted)).

standing, it is easy to blur the distinction between an antitrust violation and an antitrust injury, as the district court did; so we will examine both for purposes of judicial economy.

## I.  ANTITRUST VIOLATION

To avoid dismissal, appellants had to allege an antitrust violation stemming from the Banks' transgression of Section One of the Sherman Act: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1; see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 553-63 (2007).  Schematically, appellants' claims are uncomplicated.  They allege that the Banks, as sellers, colluded to depress LIBOR, and thereby increased the cost to appellants, as buyers, of various LIBOR-based financial instruments, a cost increase reflected in reduced rates of return.  In short, appellants allege a horizontal price-fixing conspiracy, "perhaps the paradigm of an unreasonable restraint of trade."  NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 100 (1984).

Since appellants allege that the LIBOR "must be characterized as an inseparable part of the price," and since we must accept that allegation as true for present purposes, the claim is one of price-fixing.  Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 648 (1980).  In urging otherwise, the Banks argue that LIBOR is not itself a price, as it is not itself bought or sold by anyone.  The point is immaterial.  LIBOR forms a component of the return from various LIBOR-denominated financial instruments, and the fixing of a component of price violates the antitrust laws.  See id.; see also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222 (1940) ("[P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, *or if by various formulae they are related to the market prices*.  They are fixed because they are agreed upon." (emphasis added)); Plymouth Dealers' Ass'n of No. Cal. v. United States, 279 F.2d 128, 132 (9th Cir. 1960) (holding that use of a common fixed list price constituted price-fixing despite independently negotiated departures from said list price).

Horizontal price-fixing conspiracies among competitors are unlawful *per se*, that is, without further inquiry.  See Leegin Creative Leather Prods., Inc. v.

20

PSKS, Inc., 551 U.S. 877, 886 (2007) ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices . . . ."); Catalano, 446 U.S. at 647 ("A horizontal agreement to fix prices is the archetypal example of such a practice [that is plainly anticompetitive]. It has long been settled that [such] an agreement to fix prices is unlawful *per se*."). The unfamiliar context of appellants' horizontal price-fixing claims provides no basis to disturb application of the *per se* rule. See Arizona v. Maricopa Cty. Med. Soc'y, 457 U.S. 332, 349 (1982) ("We are equally unpersuaded by the argument that we should not apply the *per se* rule in this case because the judiciary has little antitrust experience in the health care industry. The argument quite obviously is inconsistent with *Socony-Vacuum*. In unequivocal terms, we stated that, '[w]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.'" (alteration in original) (quoting Socony-Vacuum, 310 U.S. at 222)).

Appellants have therefore plausibly alleged an antitrust violation attributable to the Banks, for which appellants seek damages.

## II.  ANTITRUST STANDING

Although appellants charge the Banks with hatching and executing a horizontal price-fixing conspiracy, a practice that is *per se* unlawful, they are not "absolve[d] . . . of the obligation to demonstrate [antitrust] standing."  <u>Daniel</u>, 428 F.3d at 437.  Two issues bear on antitrust standing:

[1] have appellants suffered antitrust injury?

[2] are appellants efficient enforcers of the antitrust laws?

The second raises a closer question in this case.

The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.  <u>See</u> <u>Port Dock</u>, 507 F.3d at 121-22; <u>see</u> <u>also</u> <u>Associated Gen. Contractors</u>, 459 U.S. at 540-44.  Built into the analysis is an assessment of the "chain of causation" between the violation and the injury.  <u>Associated Gen. Contractors</u>, 459 U.S. at 540.

22

The district court, having found that appellants failed to plausibly allege antitrust injury, had no occasion to consider the efficient enforcer factors. We conclude that, although the district court erred in finding that appellants suffered no antitrust injury, remand is necessary for proper consideration of the efficient enforcer factors.

## A.  ANTITRUST INJURY

Section 4 of the Clayton Act provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).  The Supreme Court construes the Clayton Act to require a showing of antitrust injury.  See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) ("We therefore hold that the plaintiffs . . . must prove more than injury causally linked to an illegal presence in the market.  Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.").  An antitrust injury "should reflect the anticompetitive effect either

23

of the violation or of anticompetitive acts made possible by the violation." Id.  It

is therefore evident that "'Congress did not intend the antitrust laws to provide a

remedy in damages for all injuries that might conceivably be traced to an

antitrust violation.'"  Associated Gen. Contractors, 459 U.S. at 534 (quoting

Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n.14 (1972)).

    Appellants have pled antitrust injury.  Generally, when consumers,

because of a conspiracy, must pay prices that no longer reflect ordinary market

conditions, they suffer "injury of the type the antitrust laws were intended to

prevent and that flows from that which makes defendants' acts unlawful."

Brunswick, 429 U.S. at 489.  See Kirtsaeng v. John Wiley & Sons, Inc., 133 S. Ct.

1351, 1363 (2013) ("'[T]he principal objective of antitrust policy is to maximize

consumer welfare by encouraging firms to behave competitively.'" (alteration in

original) (quoting 1 Areeda & Hovenkamp, Antitrust Law ¶ 100, p. 4 (3d ed.

2006))); NCAA, 468 U.S. at 106-07 ("The anticompetitive consequences of this

arrangement are apparent . . . . Price is higher and output lower than they would

otherwise be, and *both are unresponsive to consumer preference*.  This latter point is

perhaps the most significant, since 'Congress designed the Sherman Act as a

consumer welfare prescription.'" (emphasis added) (quoting Reiter v. Sonotone

24

Corp., 442 U.S. 330, 343 (1979))); State of New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1079 (2d Cir. 1988) ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act . . . .").

True, appellants remained free to negotiate the interest rates attached to particular financial instruments; however, antitrust law is concerned with influences that corrupt market conditions, not bargaining power. "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." Socony-Vacuum, 310 U.S. at 221; see also Plymouth Dealers' Ass'n, 279 F.2d at 132 ("[T]he fact that the dealers used the fixed uniform list price in most instances only as a starting point, is of no consequence. It was an agreed starting point; it had been agreed upon between competitors; it was in some instances in the record respected and followed; it had to do with, and had its effect upon, price."

25

(footnote omitted)).  This consideration may well bear upon contested issues of

causation, but it does not foreclose antitrust injury.[11]

This conclusion is settled by Supreme Court precedents beginning with

Socony-Vacuum, the "seminal case" holding that horizontal "price fixing remains

*per se* unlawful."  Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001).  The

defendant oil companies in Socony-Vacuum collusively raised the spot market

prices for oil, which (like LIBOR) were determined by averaging submitted price

quotes; this conduct violated Section One because "[p]rices rose and jobbers and

consumers in the Mid-Western area paid more for their gasoline than they would

have paid but for the conspiracy.  Competition was not eliminated from the

markets; but it was clearly curtailed, since restriction of the supply of gasoline . . .

reduced the play of the forces of supply and demand."  Socony-Vacuum, 310 U.S.

at 220.  Although the price-fixing conspiracy was not solely responsible for the

---

[11] See Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 989 (9th Cir. 2000) ("[T]hat argument merely denies that the plaintiffs were damaged in fact. It does not speak to the complaint, which alleges that the plaintiffs *were* damaged when the defendants fixed milk prices at artificially low levels and thereby caused plaintiffs to receive[] less for milk than they otherwise would have received in the absence of the defendants' unlawful conduct.  These disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion." (alteration in original) (internal quotation marks omitted)).

increased prices, "[t]here was ample evidence that the buying programs at least *contributed* to the price rise and the stability of the spot markets, and to increases in the price of gasoline sold in the Mid-Western area . . . . That other factors also may have contributed to that rise and stability of the markets is immaterial." Id. at 219 (emphasis added). Similarly, "the fact that sales on the spot markets were still governed by some competition [wa]s of no consequence." Id. at 220.

Socony-Vacuum deemed horizontal price-fixing illegal without further inquiry because horizontal price-fixing is anathema to an economy predicated on the undisturbed interaction between supply and demand. See id. at 221 ("If the so-called competitive abuses were to be appraised here, the reasonableness of prices would necessarily become an issue in every price-fixing case. In that event the Sherman Act would soon be emasculated; its philosophy would be supplanted by one which is wholly alien to a system of free competition; it would not be the charter of freedom which its framers intended."); id. at 224 n.59 ("The effectiveness of price-fixing agreements is dependent upon many factors, such as competitive tactics, position in the industry, [and] the formula underlying price policies. Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness.

27

They are . . . banned because of their actual or *potential* threat to the central

nervous system of the economy." (emphasis added)).

Building upon <u>Socony-Vacuum</u>, the Supreme Court ruled in <u>Blue Shield of</u>

<u>Va. v. McCready</u>, 457 U.S. 465 (1982), that a subscriber to an insurance plan

suffered antitrust injury by reason of the insurer's decision, made in collusion

with a psychiatric society, to reimburse subscribers for psychotherapy performed

by psychiatrists but not psychologists: "[a]s a consumer of psychotherapy

services entitled to financial benefits under the Blue Shield plan, we think it clear

that McCready was 'within that area of the economy . . . endangered by [that]

breakdown of competitive conditions' resulting from Blue Shield's selective

refusal to reimburse." <u>Id.</u> at 480-81 (second alternation in original) (quoting <u>In re</u>

<u>Multidistrict Vehicle Air Pollution M.D.L. No. 31</u>, 481 F.2d 122, 129 (9th Cir.

1973)).

<u>Brunswick</u>'s expansive definition of "anticompetitive effect" relieves a

Section Four plaintiff of "'prov[ing] an actual lessening of competition in order to

recover . . . .' [W]hile an increase in price resulting from a dampening of

competitive market forces is assuredly one type of injury for which § 4

potentially offers redress, that is not the only form of injury remediable under §

4." Id. at 482-83 (citation omitted) (quoting Brunswick, 429 U.S. at 489 n.14).  The

consumer in McCready was found to have pled a cognizable antitrust injury,

having charged "a purposefully *anticompetitive scheme* . . . . Although [she] was

not a competitor of the conspirators, the injury she suffered was inextricably

intertwined with the injury the conspirators sought to inflict on psychologists

and the psychotherapy market."  Id. at 483-84.

As in McCready, the anticompetitive effect of the Banks' alleged

conspiracy would be that consumers got less for their money.  The Supreme

Court has warned of the antitrust dangers lurking in the activities of private

standard-setting associations: "There is no doubt that the members of such

associations often have economic incentives to restrain competition and that the

product standards set by such associations have a serious potential for

anticompetitive harm . . . . Accordingly, private standard-setting associations

have traditionally been objects of antitrust scrutiny."  Allied Tube & Conduit

Corp. v. Indian Head, Inc., 486 U.S. 492, 500 (1988) (footnote and citation

omitted).

Appellants have plausibly alleged antitrust injury.  They have identified an

"illegal anticompetitive practice" (horizontal price-fixing), have claimed an actual

29

injury placing appellants in a "'worse position' as a consequence" of the Banks'

conduct, and have demonstrated that their injury is one the antitrust laws were

designed to prevent.  Gatt, 711 F.3d at 76 (quoting Brunswick, 429 U.S. at 486).

*  *  *

The district court's contrary conclusion rested in part on the syllogism that

since the LIBOR-setting process was a "cooperative endeavor," there could be no

anticompetitive harm.  LIBOR I, 935 F. Supp. 2d at 688.  But appellants claim

violation (and injury in the form of higher prices) flowing from the corruption of

the rate-setting process, which (allegedly) turned a process in which the Banks

jointly participated into conspiracy.  "[T]he machinery employed by a

combination for price-fixing is immaterial."  Socony-Vacuum, 310 U.S. at 223.[12]

The district court drew a parallel between the LIBOR-setting process and the

collaborative venture in Allied Tube (though the standard-setting in Allied Tube

likewise posed antitrust concerns): "Like the LIBOR-setting process, the process

of forming the safety standard [in Allied Tube] was a cooperative endeavor by

---

[12] A leading antitrust treatise has similarly seized on this defect.  See IIA
Areeda & Hovenkamp, Antitrust Law ¶ 337 p. 100 n.3 (4th ed. 2014) (labeling
LIBOR I a "troublesome holding that purchasers of instruments subject to LIBOR
rate manipulation did not suffer antitrust injury because LIBOR agreements were
never intended to be anticompetitive but rather the product of joint production").

otherwise-competing companies under the auspices of a trade association."
LIBOR I, 935 F. Supp. 2d at 693.  The Banks were indeed engaged in a joint

process, and that endeavor was governed by rules put in place to prevent

collusion.  But the crucial allegation is that the Banks circumvented the LIBOR-

setting rules, and that joint process thus turned into collusion.  See, e.g., Allied

Tube, 486 U.S. at 506-07 ("[P]rivate standard-setting by associations comprising

firms with horizontal and vertical business relations is permitted at all under the

antitrust laws only on the understanding that it will be conducted in a

nonpartisan manner offering procompetitive benefits . . . ."); Maple Flooring

Mfrs.' Ass'n v. United States, 268 U.S. 563, 582-83 (1925) (distinguishing between

dissemination of pertinent information that stabilizes production and price,

which is not unlawful, and improper use of that information through "any

concerted action which operates to restrain the freedom of action of those who

buy and sell").

Equally unsound was the district court's dismissal on the ground that

appellants failed to plead harm to competition.  See LIBOR I, 935 F. Supp. 2d at

688-89.  "[A] § 4 plaintiff need not 'prove an actual lessening of competition in

order to recover.'"  McCready, 457 U.S. at 482 (quoting Brunswick, 427 U.S. at 489

n.14). If *proof* of harm to competition is not a prerequisite for recovery, it follows that *allegations* pleading harm to competition are not required to withstand a motion to dismiss when the conduct challenged is a *per se* violation. See Maricopa Cty., 457 U.S. at 351 ("The anticompetitive potential inherent in . . . price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."); Catalano, 446 U.S. at 650 ("[S]ince price-fixing agreements have been adjudged to lack any redeeming virtue, [they are] conclusively presumed illegal without further examination . . . ." (internal quotation marks omitted)).[13] The Third Circuit made that point in Pace Elecs., Inc. v. Canon Comput. Sys., Inc., 213 F.3d 118, 123-24 (3d Cir. 2000):

> [W]e believe that requiring a plaintiff to demonstrate that an injury stemming from a *per se* violation of the antitrust laws caused an actual adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a *per se* violation into a case to be judged under the rule of reason . . . . Implicit in the [Supreme] Court's approach is that a plaintiff who had suffered loss as a result of an anticompetitive aspect of a *per se* restraint of trade agreement would have suffered

---

[13] Although these cases apply the *per se* rule to price-fixing agreements generally, the Supreme Court has clarified that "the rule of reason, not a *per se* rule of unlawfulness, [is] the appropriate standard to judge vertical price restraints." Leegin, 551 U.S. at 899. This has no bearing on this case in which appellants allege a *horizontal* price-fixing conspiracy.

antitrust injury, without demonstrating that the challenged practice had an actual, adverse economic effect on a relevant market.

Appellants have alleged an anticompetitive tendency: the warping of market factors affecting the prices for LIBOR-based financial instruments. No further showing of actual adverse effect in the marketplace is necessary. This attribute separates evaluation of *per se* violations--which are presumed illegal--from rule of reason violations, which demand appraisal of the marketplace consequences that flow from a particular violation.[14]

The district court observed that LIBOR did not "necessarily correspond to the interest rate charged for any actual interbank loan." LIBOR I, 935 F. Supp. 2d at 689. This is a disputed factual issue that must be reserved for the proof stage. But even if none of the appellants' financial instruments paid interest *at* LIBOR, Socony-Vacuum allows an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices. See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 656 (7th Cir. 2002) ("The third trap is failing

---

[14] See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993) ("In the general run of cases a plaintiff must prove an antitrust injury under the rule of reason. Under this test plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market . . . .").

to distinguish between the existence of a conspiracy and its efficacy.  The

defendants point out that many of the actual sales . . . were made at prices below

the defendants' list prices, and they intimate . . . that therefore even a bald-faced

agreement to fix list prices would not be illegal in this industry . . . . That is

wrong.  An agreement to fix list prices is . . . a per se violation of the Sherman Act

even if most or for that matter all transactions occur at lower prices.").

    The district court deemed it significant that appellants could have

"suffered the same harm under normal circumstances of free competition."

LIBOR I, 935 F. Supp. 2d at 689.  True; but antitrust law relies on the probability

of harm when evaluating *per se* violations.  See Catalano, 446 U.S. at 649 ("[T]he

fact that a practice may turn out to be harmless in a particular set of

circumstances will not prevent its being declared unlawful *per se*.").

    The test fashioned by the district court was based on an over-reading of

Brunswick and of Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328

(1990) ("ARCO").  At most, these cases stand for the proposition that competitors

who complain of low fixed prices do not suffer antitrust injury.  See ARCO, 495

U.S. at 345-46 ("We decline to dilute the antitrust injury requirement here because

we find that there is no need to encourage private enforcement by competitors of

34

the rule against vertical, maximum price fixing . . . . [P]roviding the competitor a cause of action would not protect the rights of dealers and consumers under the antitrust laws.")． Neither <u>ARCO</u> nor <u>Brunswick</u> treated antitrust injury as one that could *not* have been suffered under normal competitive conditions.[15] As <u>ARCO</u> explains: "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior"; rigging a price component to thwart ordinary market conditions is one such "aspect or effect." 495 U.S. at 344. The district court opinion emphasizes that appellants "have not alleged any structural effect wherein defendants improved their position relative to their competitors." <u>LIBOR I</u>, 935 F. Supp. 2d at 692. However, appellants sustained their burden of showing injury by alleging that they paid artificially fixed higher prices.

---

[15] The district court's musing that the same harm could have occurred if the defendants each "independently" submitted a "LIBOR quote that was artificially low" is similarly inapt and amounts to forcing antitrust plaintiffs to rule out the possibility of unilateral action causing their asserted injury; this notion is unsupported by precedent. <u>LIBOR I</u>, 935 F. Supp. 2d at 691.

Whether the Banks' competitors were *also* injured is not decisive, and possibly not germane.[16]

\* \* \*

"Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action . . . . [T]he potency of the [§ 4] remedy implies the need for some care in its application." <u>McCready</u>, 457 U.S. at 477. At the same time, the "unrestrictive language of the section, and the avowed breadth of the congressional purpose" in enacting this remedial provision "cautions [courts] not to cabin § 4 in ways that will defeat its broad remedial objective." <u>Id.</u> Accommodation of both aims requires courts to consider "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned, in making . . . conduct unlawful and in providing a private remedy under § 4." <u>Id.</u> at 478. The Sherman Act safeguards consumers from marketplace abuses; appellants are consumers claiming injury from a horizontal price-fixing conspiracy. They have accordingly plausibly alleged antitrust injury.

---

[16] This Court has said in dicta that harm to competition is necessary to show antitrust injury. <u>See</u> <u>Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.</u>, 467 F.3d 283, 294 (2d Cir. 2006) ("Without harm to competition, there can be no antitrust injury and consequently, no antitrust standing."). This position cannot be reconciled with Supreme Court precedent.

## B.  THE EFFICIENT ENFORCER FACTORS[17]

The second question that bears on antitrust standing is whether appellants satisfy the efficient enforcer factors.  See Daniel, 428 F.3d at 443 ("Even if we were to conclude that the plaintiffs had adequately stated an antitrust injury, that would not necessarily establish their standing to sue in this case.  'A showing of antitrust injury is necessary, but not always sufficient,' to establish standing." (quoting Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110 n.5 (1986))).  The district court did not reach this issue because it dismissed for lack of antitrust injury.  We are not in a position to resolve these issues, which may entail further inquiry, nor are we inclined to answer the several relevant questions without prior consideration of them by the district court.

The four efficient enforcer factors are: (1) the "directness or indirectness of the asserted injury," which requires evaluation of the "chain of causation" linking appellants' asserted injury and the Banks' alleged price-fixing; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which appellants' damages claim is "highly speculative"; and (4) the importance

---

[17] Judge Lynch does not join this section, believing that it is unnecessary to the resolution of the case and that it is preferable to allow the district court to address the question first, with the aid of briefing.

37

of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." Associated Gen. Contractors, 459 U.S. at 540-45.

These factors require close attention here given that there are features of this case that make it like no other, and potentially bear upon whether the aims of the antitrust laws are most efficiently advanced by appellants through these suits.

There are many other enforcement mechanisms at work here. In addition to the plaintiffs in the numerous lawsuits consolidated here, the Banks' conduct is under scrutiny by government organs, bank regulators and financial regulators in a considerable number of countries. This background context bears upon the need for appellants as instruments for vindicating the Sherman Act.

The factors are considered in order.

A.    Causation. As to the "directness or indirectness of the asserted injury," id. at 540, a number of questions arise, including the relevant market (whether for LIBOR-denominated instruments, for interest-bearing products generally, or simply for money) and the antitrust standing of those plaintiffs who did not deal directly with the Banks. Umbrella standing concerns are most often

evident when a cartel controls only part of a market, but a consumer who dealt

with a non-cartel member alleges that he sustained injury by virtue of the cartel's

raising of prices in the market as a whole. See generally In re Processed Egg

Prods. Antitrust Litig., No. 08-MD-2002, 2015 WL 5544524, at *14 (E.D. Pa. Sept.

18, 2015); William H. Page, The Scope of Liability for Antitrust Violations, 37

STAN. L. REV. 1445, 1465-74 (1985). The antitrust standing of umbrella purchasers

under such circumstances has produced a split in authority among our sister

circuits. Compare U.S. Gypsum Co. v. Ind. Gas Co., 350 F.3d 623, 627 (7th Cir.

2003) ("A cartel cuts output, which elevates price throughout the market;

customers of fringe firms (sellers that have not joined the cartel) pay this higher

price, and thus suffer antitrust injury, just like customers of the cartel's

members."), and In re Beef Indus. Antitrust Litig., 600 F.2d 1148, 1171 n.24 (5th

Cir. 1979) ("It is immaterial whether or not a steer purchased from a plaintiff

found its way into the hands of a conspirator retailer. It is enough if, as alleged,

the conspirators' activities caused a general depression in wholesale prices and

the intermediary purchasing from a plaintiff based his pricing decision on the

depressed wholesale beef price."), with Mid-West Paper Prods. Co. v. Cont'l Grp.

Inc., 596 F.2d 573, 580-87 (3d Cir. 1979) (noting risk that treble damages,

39

spreading beyond area of defendants' direct sales, "'would result in an overkill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress'" (quoting <u>Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.</u>, 454 F.2d 1292, 1295 (2d Cir. 1971))**.**

At first glance, here there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks. At the same time, however, if the Banks control only a small percentage of the ultimate identified market, <u>see</u> <u>LIBOR I</u>, 935 F. Supp. 2d at 679 (observing that "LIBOR affects the pricing of trillions of dollars' worth of financial transactions"), this case may raise the very concern of damages disproportionate to wrongdoing noted in <u>Mid-West Paper</u>, 596 F.3d at 580-87. Requiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would, if appellants' allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated.

B.  <u>Existence of More Direct Victims</u>.  This consideration seems to bear
chiefly on whether the plaintiff is a consumer or a competitor, and in this
litigation appellants allege status as consumers.  But consumer status is not the
end of the inquiry; the efficient enforcer criteria must be established irrespective
of whether the plaintiff is a consumer or a competitor.  <u>See</u> <u>Sunbeam Television
Corp. v. Nielsen Media Research, Inc.</u>, 711 F.3d 1264, 1273 (11th Cir. 2013).
Implicit in the inquiry is recognition that not every victim of an antitrust
violation needs to be compensated under the antitrust laws in order for the
antitrust laws to be efficiently enforced.  Moreover, one peculiar feature of this
case is that remote victims (who acquired LIBOR-based instruments from any of
thousands of non-defendant banks) would be injured to the same extent and in
the same way as direct customers of a the Banks.  The bondholders, for example,
purchased their bonds from other sources.  Crediting the allegations of the
complaints, an artificial depression in LIBOR would injure anyone who bought
bank debt pegged to LIBOR from any bank anywhere.  So in this case directness
may have diminished weight.

C.  <u>Speculative Damages</u>.  "'The most elementary conceptions of justice

and public policy require that the wrongdoer shall bear the risk of the
uncertainty which his own wrong has created.'" In re DDAVP Direct Purchaser
Antitrust Litig., 585 F.3d 677, 689 (2d Cir. 2009) (alteration omitted) (quoting
Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265 (1946)).  Still, highly
speculative damages is a sign that a given plaintiff is an inefficient engine of
enforcement.

Any damages estimate would require evidence to "'support a just and
reasonable estimate' of damages," and it is difficult to see how appellants would
arrive at such an estimate, even with the aid of expert testimony.  U.S. Football
League v. Nat'l Football League, 842 F.2d 1335, 1378 (2d Cir. 1988) (quoting
Bigelow, 327 U.S. at 264).  At the same time, some degree of uncertainty stems
from the nature of antitrust law.  See J. Truett Payne Co., Inc. v. Chrysler Motors
Corp., 451 U.S. 557, 566 (1981) ("Our willingness to accept a degree of uncertainty
in these cases rests in part on the difficulty of ascertaining business damages as
compared, for example, to damages resulting from a personal injury or from
condemnation of a parcel of land.  The vagaries of the marketplace usually deny
us sure knowledge of what plaintiff's situation would have been in the absence of
the defendant's antitrust violation.").  Impediments to reaching a reliable

42

damages estimate often flow from the nature and complexity of the alleged antitrust violation.  See DDAVP, 585 F.3d at 689.

The issue here is whether the damages would necessarily be "highly speculative."  Associated Gen. Contractors, 459 U.S. at 542.  And as to that, this case presents some unusual challenges.  The disputed transactions were done at rates that were negotiated, notwithstanding that the negotiated component was the increment above LIBOR.  And the market for money is worldwide, with competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all.


D.  Duplicative Recovery and Complex Damage Apportionment.  The complaints reference government and regulatory investigations and suits, which are indeed the basis for many of the allegations made and documents referenced in the complaints.  The transactions that are the subject of investigation and suit are countless and the ramified consequences are beyond conception.  Related proceedings are ongoing in at least several countries.  Some of those government initiatives may seek damages on behalf of victims, and for apportionment among them.  Others may seek fines, injunctions, disgorgement, and other remedies

43

known to United States courts and foreign jurisdictions.  It is wholly unclear on

this record how issues of duplicate recovery and damage apportionment can be

assessed.

*  *  *

The efficient enforcer factors reflect a "concern about whether the putative

plaintiff is a proper party to 'perform the office of a private attorney general' and

thereby 'vindicate the public interest in antitrust enforcement.'"  <u>Gatt</u>, 711 F.3d at

80 (quoting <u>Associated Gen. Contractors</u>, 459 U.S. at 542).  We remand for the

district court to consider these matters in the first instance.

### III.

The Banks urge affirmance on the alternative ground that appellants have

not adequately alleged conspiracy.  The district court's opinion expressed no

view on this issue, having dismissed appellants' case for lack of antitrust

standing.  But there is no point in remanding for consideration of this question

because the district court expressed its position in a recent decision adjudicating

motions to dismiss new complaints that asserted claims identical to those

44

presently before us:[18] "parallel conduct need not imply a conspiracy, and

certainly not where each supposed conspiracy independently had the same

motive (namely, to protect its own reputation for creditworthiness) to engage

independently in the same misconduct . . . . Plaintiffs' remaining allegations do

not support the pleading of a broad-based conspiracy to manipulate USD LIBOR

for traders' benefit or to suppress LIBOR during the financial crisis."  In re

LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262, 2015 WL

4634541, at *41-*44 (S.D.N.Y. Aug. 4, 2015) ("LIBOR IV").  The parties have

briefed this issue on appeal; judicial economy is accordingly served by our

consideration of the question now.  To survive dismissal, "the plaintiff need not

show that its allegations suggesting an agreement are more likely than not true or

that they rule out the possibility of independent action, as would be required at

later litigation stages such as a defense motion for summary judgment, or a trial."

Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012)

(citations omitted).  Rather, "[b]ecause plausibility is a standard lower than

--------------------------------------------

[18] These complaints were filed by new plaintiffs, including the Federal Home
Loan Mortgage Corporation ("Freddie Mac"), who sought to join the present
appeal as amici.  That motion was denied because these plaintiffs elected not to
join the appeal at the outset as instructed by Gelboim.  See In re: LIBOR-Based
Fin. Instruments Antitrust Litig., No. 13-3565 (2d Cir. Sept. 18, 2015) (Doc. 557).

probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible . . . . The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." Id. at 184-85 (citations omitted). Skepticism of a conspiracy's existence is insufficient to warrant dismissal; "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

"In order to establish a conspiracy in violation of § 1 . . . proof of joint or concerted action is required; proof of unilateral action does not suffice." Anderson News, 680 F.3d at 183. "'Circumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" Id. (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)). It follows, then, that a "complaint alleging merely parallel conduct is not sustainable." Id. at 184. At the same time, "conspiracies are rarely evidenced by explicit agreements" and "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged

46

conspirators.'"  Id. at 183 (quoting Michelman v. Clark-Schwebel Fiber Glass

Corp., 534 F.2d 1036, 1043 (2d Cir. 1976)).  "At the pleading stage, a complaint

claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as

true) to suggest that an agreement was made . . . .'"  Id. at 184 (quoting Twombly,

550 U.S. at 556).

The line separating conspiracy from parallelism is indistinct, but may be

crossed with allegations of "interdependent conduct," "accompanied by

circumstantial evidence and plus factors."  Mayor & City Council of Balt. v.

Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013) (quoting Todd, 275 F.3d at 198).

These plus factors include: (1) "'a common motive to conspire'"; (2) "'evidence

that shows that the parallel acts were against the apparent individual economic

self-interest of the alleged conspirators'"; and (3) "'evidence of a high level of

interfirm communications.'"  Id. (quoting Twombly v. Bell Atl. Corp., 425 F.3d

99, 114 (2d Cir. 2005)).  "[T]hese plus factors are neither exhaustive nor exclusive,

but rather illustrative of the type of circumstances which, when combined with

parallel behavior, might permit a jury to infer the existence of an agreement." Id.

n.6.

Close cases abound on this issue, but this is not one of them; appellants'

47

complaints contain numerous allegations that clear the bar of plausibility.[19]

These allegations evince a common motive to conspire--increased profits and the

projection of financial soundness--as well as a high number of interfirm

_____

[19] See, e.g., OTC Second Amended Complaint at 33 ¶ 87 ("Barclays also knew that the other panel banks, acting as a pack, were submitting USD LIBOR rates that were too low. Barclays' employees revealed that ***all of the Contributor Panel banks***, including Barclays, were submitting rates that were too low." (bolding and emphasis in original) (internal quotation marks omitted)); id. at 36 ¶ 92 ("On May 21, 2008, a Wall Street Journal reporter asked UBS, by email, why back in mid-April . . . UBS had been paying 12 basis points for [commercial paper] more than it was posting as a Libor quote? The senior manager . . . forwarded a proposed answer . . . stating: the answer would be because ***the whole street was doing the same and because we did not want to be an outlier in the libor fixings, just like everybody else***." (bolding and emphasis in original) (internal quotation marks omitted)); id. at 40 ¶ 108 ("For example, a November 29, 2007 email shows that Barclays knew, in advance of the submission deadline, the proposed confidential submissions of ***every USD LIBOR panel bank***.

> On 29 November 2007, all the contributing banks' submissions for one month US dollar LIBOR increased by a range of 35 to 48 basis points. Barclays' submission increased from 4.86 on 28 November to 5.3 on 29 November (an increase of 44 basis points). The offer that Barclays saw in the market was 30 basis points higher, at 5.60. Barclays' Submitter had intended to submit a rate of 5.50 on that day. However he was overruled on a conference call during which the submissions were discussed, as a rate of 5.50 was expected to draw negative media attention (***as this would have been 20 basis points above the next highest submission***). Manager E said on the call that ***it's going to cause a sh\*t storm***.")

(bolding and emphasis in original).

communications, including Barclays' knowledge of other banks' confidential

individual submissions in advance.  The parallelism is accompanied by plus

factors plausibly suggesting a conspiracy, to say nothing of the economic

evidence in the complaints--such as the LIBOR-FRED divergence--further

supporting an inference of conspiracy.[20]  The Banks argue that the "pack"

behavior described in the complaints is equally consistent with parallelism.

Maybe; but at the motion-to-dismiss stage, appellants must only put forth

sufficient factual matter to plausibly suggest an inference of conspiracy, *even if*

the facts are susceptible to an equally likely interpretation.  See Anderson News,

680 F.3d at 184 ("Because plausibility is a standard lower than probability, a

given set of actions may well be subject to diverging interpretations, each of

which is plausible.").

---

[20] See also OTC Second Amended Complaint at 44 ¶¶ 116-17  ("Further demonstrating UBS submitters' stunning ability to consistently target the actual published LIBOR rates despite a volatile market, the DOJ found that from June 18, 2008, and continuing for approximately the same 10 month period, UBS's 3-month LIBOR submissions were identical to the published LIBOR fix, and largely consistent with the published LIBOR fix in the other tenors.  Using probability analysis, the consulting expert then calculated the likelihood to be ***less than 1 %*** that UBS could have achieved this remarkable consistency based on consideration of the prior day's interquartile range LIBOR Panel Bank submissions." (bolding and emphasis in original)).

Because appellants have plausibly alleged the existence of an inter-bank conspiracy, the district court's decision cannot be affirmed on the alternative basis urged by the Banks.

## IV.

This decision is of narrow scope. It may be that the influence of the corrupted LIBOR figure on competition was weak and potentially insignificant, given that the financial transactions at issue are complex, LIBOR was not binding, and the worldwide market for financial instruments--nothing less than the market for money--is vast, and influenced by multiple benchmarks. The net impact of a tainted LIBOR in the credit market is an issue of causation reserved for the proof stage; at this stage, it is plausibly alleged on the face of the complaints that a manipulation of LIBOR exerted some influence on price. The extent of that influence and the identity of persons who can sue, among other things, are matters reserved for later.

Moreover, common sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR. Banks do not stockpile money, any more than bakers stockpile yeast. It seems strange that

this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender. On the other hand, the record is undeveloped and it is not even established that the Banks used LIBOR in setting rates for lending transactions. Nevertheless, the potential of a wash requires further development and can only be properly analyzed at later stages of the litigation.

Although novel features of this case raise a number of fact issues, we think it is clear that, once appellants' allegations are taken as true (as must be done at this stage), they have plausibly alleged both antitrust violation and antitrust injury and thus, have cleared the motion-to-dismiss bar. It is accordingly unnecessary for us to reach or decide whether the district court erred by denying appellants leave to amend their complaints.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## Appendix A

<u>Additional Counsel for Appellants on the Brief</u>

- Karen L. Morris & Patrick F. Morris, Morris & Morris LLC,

  Wilmington, Delaware; David H. Weinstein & Robert S. Kitchenoff,

  Weinstein Kitchenoff & Asher LLC, Philadelphia, Pennsylvania, <u>for</u>

  <u>Plaintiffs-Appellants Ellen Gelboim and Linda Zacher in Case No.</u>

  <u>13-3565</u>.

- David Kovel, Kirby McInerney LLP, New York, New York;

  Christopher Lovell, Lovell Stewart Halebian Jacobson LLP, New

  York, New York, <u>for Exchange-Based Plaintiffs-Appellants and the</u>

  <u>Class in Case No. 15-454</u>.

- William Christopher Carmody & Arun Subramanian, Susman

  Godfrey LLP, New York, New York; Marc Seltzer, Susman Godfrey

  LLP, Los Angeles, California; Michael D. Hausfeld, William P.

  Butterfield, Hilary K. Scherrer & Nathaniel C. Giddings, Hausfeld

  LLP, Washington, D.C., <u>for Plaintiffs-Appellants Baltimore, New</u>

  <u>Britain, Texas Competitive Electric Holdings LLC ("TCEH") and the</u>

  <u>Proposed OTC Plaintiff Class in Case No. 15-498</u>.

52

- Steven E. Fineman & Michael J. Miarmi, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, New York; Brendan P. Glackin, Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, California, <u>for Schwab Plaintiffs-Appellants in Case No. 15-432 and for Bay Area Toll Authority in Case No. 15-778</u>.

- Nanci E. Nishimura & Matthew K. Edling, Cotchett, Pitre & McCarthy, LLP, Burlingame, California; Alexander E. Barnett, Cotchett, Pitre & McCarthy, LLP, New York, New York, <u>for Plaintiffs-Appellants The Regents of the University of California, East Bay Municipal Utility District, San Diego Association of Governments, City of Richmond, The Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, City of Riverside, The Riverside Public Financing Authority, County of Mendocino, County of Sacramento, County of San Diego, County of San Mateo, The San Mateo County Joint Powers Financing Authority, County of Sonoma and David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma in Case No. 15-733</u>.

- Richard W. Mithoff & Warner V. Hocker, Mithoff Law Firm, Houston, Texas; Nanci E. Nishimura & Matthew K. Edling, Cotchett, Pitre & McCarthy, LLP, Burlingame, California; Alexander E. Barnett, Cotchett, Pitre & McCarthy, LLP, New York, New York, <u>for Plaintiff-Appellant City of Houston in Case No. 15-744.</u>

- Steig D. Olson, Daniel L. Brockett, Daniel P. Cunningham & Jacob J. Waldman, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, <u>for Plaintiffs-Appellants The City of Philadelphia and the Pennsylvania Intergovernmental Cooperation Authority in Case No. 15-547; Darby Financial Products and Capital Ventures International in Case No. 15-551; Salix Capital US Inc. in Case Nos. 15-611 and 15-620; Prudential Investment Portfolios 2 on behalf of Prudential Core Short-Term Bond Fund and Prudential Core Taxable Money Market Fund in Case No. 15-627.</u>

- David C. Frederick, Wan J. Kim, Gregory G. Rapawy & Andrew C. Shen, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., <u>for Plaintiff-Appellant National Credit Union Administration Board in Case No. 15-537.</u>

54

- Michael J. Guzman & Andrew C. Shen, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C.; Stuart H. McCluer, McCulley McCluer PLLC, Oxford, Mississippi, <u>for Plaintiff-Appellant Guaranty Bank & Trust Company in Case No. 15-524</u>.

- Jeffrey A. Shooman, Lite DePalma Greenberg, LLC, Newark, New Jersey, for <u>Plaintiff-Appellant 33-35 Green Pond Associates, LLC in Case No. 15-441</u>.

- Scott P. Schlesinger, Jeffrey L. Haberman & Jonathan R. Gdanski, Schlesinger Law Offices, P.A., Fort Lauderdale, Florida, <u>for Plaintiffs-Appellants Amabile, et al. in Case No. 15-825</u>.

- Jason A. Zweig, Hagens Berman Sobol Shapiro LLP, New York, New York, <u>for Plaintiffs-Appellants Courtyard At Amwell, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC and Lawrence W. Gardner in Case No. 15-477</u>.

<u>Additional Counsel for Appellees on the Brief</u>

- Daryl A. Libow & Christopher M. Viapiano, Sullivan & Cromwell LLP, Washington, D.C., <u>for Defendant-Appellee The Bank of Tokyo-

Mitsubishi UFJ, Ltd.

- David H. Braff, Yvonne S. Quinn, Jeffrey T. Scott & Matthew J. Porpora, Sullivan & Cromwell LLP, New York, New York; Jonathan D. Schiller & Leigh M. Nathanson, Boies, Schiller & Flexner LLP, New York, New York; Michael Brille, Boies, Schiller & Flexner LLP, Washington, D.C., for Defendants-Appellees Barclays Bank PLC, Barclays plc and Barclays Capital Inc.

- Andrew A. Ruffino, Covington & Burling LLP, New York, New York; Alan M. Wiseman, Covington & Burling LLP, Washington, D.C., for Defendants-Appellees Citibank, N.A., Citigroup Inc., Citigroup Funding, Inc., Citigroup Global Markets Inc., Citigroup Global Markets Limited, Citi Swapco Inc. and Citigroup Financial Products, Inc.

- Herbert S. Washer, Elai Katz & Joel Kurtzberg, Cahill Gordon & Reindel LLP, New York, New York, for Defendants-Appellees Credit Suisse Group AG, Credit Suisse International, Credit Suisse AG, Credit Suisse Securities (USA) LLC and Credit Suisse (USA), Inc.

- David R. Gelfand & Sean M. Murphy, Milbank Tweed Hadley &

McCloy LLP, New York, New York, <u>for Defendant-Appellee</u>
<u>Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.</u>

- Moses Silverman & Andrew C. Finch, Paul, Weiss, Rifkind, Wharton
  & Garrison LLP, New York, New York, <u>for Defendants-Appellees</u>
  <u>Deutsche Bank AG and Deutsche Bank Securities Inc.</u>

- Donald R. Littlefield & Jack D. Ballard, Ballard & Littlefield, LLP,
  Houston, Texas, <u>for Defendants-Appellees HSBC Holdings plc and</u>
  <u>HSBC Bank plc in City of Houston v. Bank of America Corp., et al.,</u>
  <u>Case No. 1:13-cv-05616 (S.D.N.Y.).</u>

- Thomas C. Rice, Paul C. Gluckow & Shannon P. Torres, Simpson
  Thacher & Bartlett LLP, New York, New York, <u>for Defendants-</u>
  <u>Appellees JP Morgan Chase & Co, JPMorgan Chase Bank, N.A., J.P.</u>
  <u>Morgan Securities LLC (f/k/a J.P. Morgan Securities Inc.) and J.P.</u>
  <u>Morgan Dublin plc (f/k/a JPMorgan Dublin plc) (f/k/a Bear Stearns</u>
  <u>Bank plc).</u>

- Alan M. Unger & Andrew W. Stern, Sidley Austin LLP, New York,
  New York, <u>for Defendant-Appellee The Norinchukin Bank.</u>

- Christopher M. Paparella, Hughes Hubbard & Reed LLP, New York,

New York, <u>for Defendants-Appellees Portigon AG (f/k/a WestLB AG) and Westdeutsche ImmobilienBank AG.</u>

- Ed DeYoung & Gregory T. Casamento, Locke Lord LLP, New York, New York; Roger B. Cowie, Locke Lord LLP, Dallas, Texas; J. Matthew Goodin & Julie C. Webb, Locke Lord LLP, Chicago, Illinois, <u>for Defendants-Appellees HSBC Holdings plc, HSBC Bank plc, HSBC Securities (USA) Inc., HSBC Bank USA, N.A., HSBC USA, Inc. and HSBC Finance Corporation (except with regard to City of Houston v. Bank of America Corp., et al., Case No. 1:13-cv-05616 (S.D.N.Y.)).</u>

- Marc J. Gottridge & Lisa J. Fried, Hogan Lovells US LLP, New York, New York; Neal Kumar Katyal, Hogan Lovells US LLP, Washington, D.C., <u>for Defendants-Appellees Lloyds Banking Group plc, Lloyds Bank plc (f/k/a Lloyds TSB Bank plc) and HBOS plc.</u>

- Christian T. Kemnitz, Katten Muchin Rosenman LLP, Chicago, Illinois, <u>for Defendants-Appellees Royal Bank of Canada.</u>

- Steven Wolowitz & Henninger S. Bullock, Mayer Brown LLP, New York, New York, <u>for Defendant-Appellee Société Générale.</u>

- Peter Sullivan & Lawrence J. Zweifach, Gibson, Dunn & Crutcher LLP, New York, New York; Joel Sanders, Gibson, Dunn & Crutcher LLP, San Francisco, California; Thomas G. Hungar, Gibson, Dunn & Crutcher LLP, Washington, D.C., for Defendants-Appellees UBS AG, UBS Securities LLC and UBS Limited.

- Fraser L. Hunter, Jr., David S. Lesser, Alan E. Schoenfeld & Jamie S. Dycus, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York, for Defendants-Appellees The Royal Bank of Scotland Group plc and The Royal Bank of Scotland plc except as to Prudential Investment Portfolios 2.

- Robert G. Houck, Clifford Chance US LLP, New York, New York, for Defendants-Appellees The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc and RBS Securities Inc. (f/k/a Greenwich Capital Markets Inc.) except as to Yale University and the Federal Home Loan Mortgage Corporation.

- Richard D. Owens & Jeff G. Hammel, Latham & Watkins LLP, New York, New York, for Defendants-Appellees British Bankers' Association, BBA Enterprises Ltd. and BBA LIBOR Ltd.

Amici Curiae

- Rishi Bhandari, Mandel Bhandari LLP, New York, New York, <u>for Amici Curiae Financial Markets Law Professors Jordan M. Barry, Brian J. Broughman, Eric C. Chaffee, Christoph Henkel, Robert C. Hockett, Michael P. Malloy, Peter Marchetti, Christopher K. Odinet, Charles R.P. Pouncy and Andrew Verstein in support of Plaintiffs-Appellants.</u>

- Drew Hansen, Susman Godfrey LLP, Seattle, Washington; Arun Subramanian, Jacob W. Buchdahl & William Christopher Carmody, Susman Godfrey LLP, New York, New York, <u>for Amicus Curiae Yale University in support of Plaintiffs-Appellants.</u>

- Richard Wolfram, Law Office of Richard Wolfram, New York, New York, <u>for Amici Curiae Scholars Darren Bush, Michael Carrier, Peter C. Carstensen, John M. Connor, Joshua Paul Davis, Beth Farmer, Sharon F. Foster, Eleanor Fox, Thomas L. Greaney, Jeffrey L. Harrison, Thomas Horton, Herbert Hovenkamp, J. Gordon Hylton, John B. Kirkwood, Stephen Martin, Mark Patterson and Lawrence J. White in support of Plaintiffs-Appellants.</u>

- Richard M. Brunell, Vice President and General Counsel, <u>for Amicus Curiae American Antitrust Institute in support of Plaintiffs-Appellants</u>.

- Jon R. Roellke, Michael L. Whitlock & Gregory F. Wells, Morgan Lewis & Bockius LLP, Washington, D.C.; Ira D. Hammerman & Kevin M. Carroll, Washington, D.C., <u>for Amicus Curiae Securities and Financial Markets Association in support of Defendants-Appellees</u>.

- Donald I. Baker, W. Todd Miller & Lucy S. Clippinger, Baker & Miller PLLC, Washington, D.C., <u>for Amici Curiae Antitrust Scholars Keith N. Hylton, Michael Jacobs, Geoffrey A. Manne, Justin McCrary and William J. Murphy in support of Defendants-Appellees</u>.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit